GRUPO INDUSTRIAL CAMESA, Camercial Camesa, Cables Camesa and Camesa Inc., Plaintiffs–Appellants,

and

Wire Rope Importers' Association, Plaintiff,

v.

The UNITED STATES, Defendant–Appellee,

and

Committee Of Domestic Steel Wire Rope and Specialty Cable Manufacturers, Defendant–Appellee.

No. 94–1436.

United States Court of Appeals, Federal Circuit.

June 10, 1996.

David C. Frederick, Shearman & Sterling, Washington, D.C., argued, for plaintiffs-appellants. With him on the brief were Thomas B. Wilner and Jeffrey M. Winton. Of counsel was Steven E. Rindner.

Lyle Vander Schaaf, Attorney, Office of the General Counsel, Washington, D.C., argued, for defendant-appellee. With him on the brief were Lyn M. Schlitt, General Counsel and James A. Toupin, Deputy General Counsel.

Herbert E. Harris, II and Cheryl Ellsworth, Harris & Ellsworth, Washington, D.C., for defendant-appellee, Committee of Domestic Steel Wire Rope and Specialty Cable Manufacturers.

Larry Klayman, Klayman & Associates, P.C., Washington, D.C., for plaintiff.

Before ARCHER, Chief Judge, BENNETT, Senior Circuit Judge, and NEWMAN, Circuit Judge.

ARCHER, Chief Judge.

Grupo Industrial Camesa et al. (Camesa) appeal the judgment of the United States Court of International Trade affirming the International Trade Commission's (Commission) final determination that during 1989 to 1992 an industry in the United States was materially injured by reason of imports of steel wire rope from Mexico and the Republic of Korea. *Grupo Indus. Camesa v. United States*, 853 F.Supp. 440 (Ct. Int'l Trade 1994). We affirm.

## BACKGROUND

In April 1992 an antidumping action was filed against imports of steel wire rope from Mexico and Korea. The Department of Commerce determined that these imports were being sold in the United States at less than fair value, *Steel Wire Rope from Mexico*, 58 Fed.Reg. 7531 (Dep't Comm.1993) (final determination); *Steel Wire Rope from Korea*, 58 Fed.Reg. 11029, 11030 (Dep't Comm.1993) (final determination). The Commission conducted an investigation to determine whether, pursuant to 19 U.S.C. § 1673d(b)(1) (1988),[1] the importation of the steel wire rope had materially injured, or threatened to materially injure, a United States industry. During the course of its investigation, the Commission held a hearing which one of its six commissioners did not attend. Another commissioner attended only part of the hearing. As a result of its investigation, the Commission determined by an equally divided vote (*see* 19 U.S.C. § 1677(11) (1994)) that an industry in the United States was materially injured by reason of the imports of steel wire rope. *Steel Wire Rope from the Republic of Korea and Mexico*, USITC Pub. 2613, Inv. Nos. 731–TA–546 & 547 (March 1993) (hereinafter "Final Determination").

Camesa, a Mexican producer of steel wire rope, appealed the Commission's determination to the Court of International Trade. Camesa argued that the commissioners who found material injury included the two who did not fully attend the hearing and that those two commissioners were not competent to vote. It also contended that the Commission's determination was inconsistent with the facts because the evidence showed that imported steel wire rope did not compete with domestic steel wire rope, and that the Commission's analysis was legally flawed because it failed to consider the industry's performance in the context of the business cycle as required by 19 U.S.C. § 1677(7)(C)(iii) (1994). The Court of International Trade held that it was not improper for the commissioners who did not attend the hearing to vote on the final determination and that the Commission's finding of material injury was supported by substantial evidence. Although the Commission did not make an explicit finding concerning the effect of the business cycle, the Court of International Trade held that it did consider the evidence in the context of the industry's business cycle. Camesa raises the same issues on appeal to this court.

## DISCUSSION

We must determine whether the Court of International Trade correctly upheld the Commission's affirmative injury determination. *See Armstrong Bros. Tool Co. v. United States*, 67 C.C.P.A. 94, 626 F.2d 168, 170 (1980); *see also Matsushita Elec. Indus. v. United States*, 750 F.2d 927, 932 (Fed.Cir. 1984). To do so, we reapply the standard set forth in the statute and must uphold the finding of material injury unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994); *see Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 (Fed.Cir.1984); *Matsushita*, 750 F.2d at 932. As the Supreme Court has stated "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

---

1. We cite to the 1994 edition of the U.S.Code except where necessary to give effect to the version of the U.S.Code in force when the Commission rendered its determination.

## A.

In the course of an antidumping investigation, 19 U.S.C. § 1677c commands that "the Commission shall ... hold a hearing ... upon the request of any party to the investigation before making a final determination" of material injury. 19 U.S.C. § 1677c(a) (1988). According to Camesa, the statutory requirement is only meaningful if the commissioners voting are present at the hearing. While conceding that the Commission may have authority to delegate the responsibility for conducting the hearing to a particular commissioner or to a hearing examiner, Camesa points out that the Commission has not done so here. Camesa argues that by virtue of 19 C.F.R. § 207.23, which provides that "[t]he Commission shall hold a hearing ... before making a final determination," the entire Commission must conduct the hearing.

The Court of International Trade, on the other hand, relied on the Commission's regulation at 19 C.F.R. § 201.13(b)(1), which provides that "[p]ublic hearings or conferences in nonadjudicative investigations will be conducted by the Commission or by one or more Commissioners." It found that because Congress had intended these investigations to be investigatory rather than adjudicatory in nature, the Commission complied with its own regulations when one or more of the commissioners attended the hearing. On appeal to this court, Camesa argues that the Court of International Trade's reliance on 19 C.F.R. § 201.13 was improper because that regulation has general applicability to public hearings, whereas 19 C.F.R. § 207.23 applies specifically to final injury determinations in antidumping cases.

Regardless of which regulation is applicable, the hearing held must satisfy the statutory hearing requirement of 19 U.S.C. 1677c. It is axiomatic that a regulation cannot expand the scope of the statute under which it is promulgated. *See, e.g., Lykes Bros. S.S. Co. v. United States*, 206 Ct.Cl. 354, 513 F.2d 1342, 1350 (1975) ("[I]t is well established that a regulation which 'operates to create a rule out of harmony with the statute, is a mere nullity.'" (quoting *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936)));

*Travelstead v. Derwinski*, 978 F.2d 1244, 1250 (Fed.Cir.1992) (stating "rules cannot be promulgated that are contrary to statute"); *Alaskan Arctic Gas Pipeline Co. v. United States*, 831 F.2d 1043, 1050 (Fed.Cir.1987) (stating that a regulation must be in harmony with the statute under which it is promulgated). Section 207.23 simply restates the language of § 1677c that the Commission shall hold a hearing and does not specify whether the hearing should be conducted by the Commission or by individual commissioners, or whether the commissioners voting on the final determination need be present at the hearing. On the other hand, § 201.13, provides that hearings in nonadjudicative investigations will be conducted by the Commission or by one or more commissioners. Because the regulations can confer no more discretion to the Commission regarding the nature of the hearing than is reasonable under the statutory scheme, we look to what Congress meant when it commanded "the Commission" to hold a "hearing."

The type of hearing contemplated by § 1677c is not described anywhere in the statutory scheme. The only guidance provided by the text of the statute is in § 1677c(b) under the heading "procedures." That section only provides that the hearing shall be conducted after notice is published in the Federal Register, that a transcript shall be prepared and made available to the public, and that it shall not be subject to the provisions of 5 U.S.C. §§ 551–59 (the Administrative Procedure Act). 19 U.S.C. § 1677c(b) (1988). It does not indicate who must conduct the hearing or who may vote.

A review of the legislative history indicates that the hearing was intended to give the parties to a material injury investigation an opportunity to participate in the administrative process and present information. According to the Senate Report accompanying the legislation, the "[Commission] would be required to hold a hearing in the course of an investigation ... at any time prior to the making of a final determination" and these hearings would have to be "conducted in a manner designed to permit full presentation of information and views." Senate Comm. on Finance, Report on Trade Agreements Act of

1979, S.Rep. No. 96–249, 96th Cong., 1st Sess. 97 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 483. The Report further emphasized that it was "particularly important . . . that parties be given every possible opportunity to respond to information submitted by other parties." *Id.*, 1979 U.S.C.C.A.N. at 483. Thus, the purpose of the hearing was to give the parties an opportunity to fully present information and respond to other parties; Congress placed no other limitations on the hearings.

■ In this case Camesa had an opportunity to present fully its information and to respond to that of other parties. Indeed, it makes no allegation that it was denied a meaningful hearing. It only disagrees with the Commission's determination resulting from the hearing and the fact that two of the affirmatively voting commissioners did not attend part or all of the hearing. There is no requirement in the statute or legislative history that attendance during the hearing is a prerequisite to voting and we decline to impose such a requirement.

We discern no indication on the part of Congress to alter the normal administrative hearing procedure or to restrict the Commission to any particular type of hearing. In other statutory schemes, it is clear that an agency may substitute its judgment for that of an initial decision maker even though it was the initial decision maker who was present to hear testimony on which the decision was based. *See, e.g.,* Administrative Procedure Act, § 8, 5 U.S.C. § 557(b) (1994) [2] ("On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision. . . ."); *Morgan v. United States,* 298 U.S. 468, 481, 56 S.Ct. 906, 911–12, 80 L.Ed. 1288 (1936); *NLRB v. Stocker Mfg.,* 185 F.2d 451, 453–54 (3rd Cir.1950) (stating that the Board is obligated to examine the record and reach its own conclusions independent from the exam-

iner and may "make its findings and predicate its orders upon the written record without hearing the witnesses testify"). Thus, an agency's finder of fact does not have to be present to hear the testimony upon which the finding is based. Likewise, since neither the Commission's statute nor regulations prescribe that all the commissioners must attend the hearing, or that only the commissioners attending the hearing may vote, we conclude that the hearing conducted and the vote taken by the Commission in this case was not a violation of law. Camesa also argues that the Commission's decision did not comport with the language of *Morgan,* 298 U.S. at 481, 56 S.Ct. at 912. It contends that in *Morgan* the Supreme Court laid down the requirement that in quasi-judicial proceedings [3] the "[t]he one who decides must hear." *Id.* According to Camesa this means that all of the commissioners must actually hear the evidence.

As the Court of International Trade correctly stated, however, *Morgan* held only that the fact finder must consider the evidence, not that such person must be present to hear the evidence. In *Morgan* the Court was reviewing an action by the Secretary of Agriculture which could be taken only after a "full hearing." 298 U.S. at 479–80, 56 S.Ct. at 911. In that case the Secretary was charged with having taken action without reviewing or considering the evidence, *i.e.,* he had not "heard or read any of the evidence." *Id.* at 476, 56 S.Ct. at 909. Describing what the hearing should entail, the Court stated that the hearing "is designed to afford the safeguard that the one who decides shall be bound in good conscience to *consider* the evidence. . . . The 'hearing' is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not *considered* evidence or argument, it is manifest that a hearing has not been given." *Id.* at 480–81, 56 S.Ct. at 911 (emphasis

---

**2.** We refer to the Administrative Procedure Act as an example to show that such procedures are permissible although, as we have noted, section 1677c hearings are not subject to that Act. *See* 19 U.S.C. § 1677c(b).

**3.** Camesa and the government dispute whether an antidumping investigation is properly charac-

terized as quasi-judicial in nature or merely investigatory. Because, the hearings held in this case were sufficient for either investigatory proceedings or quasi-judicial proceedings, as described in *Morgan,* we need not decide which position is correct.

added). Thus, the Court was concerned not with the decision maker's failure to hear the evidence presented, but rather with the lack of consideration of that evidence. This is shown by the Court's acknowledgment that hearings are often held before a hearing examiner and not the decision maker. As the Court said:

> Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense. And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, *the officer who makes the determinations must consider and appraise the evidence which justifies them.*

*Id.* at 481–82, 56 S.Ct. at 912 (emphasis added). Camesa's argument that the commissioners must be present to hear the evidence is, therefore, belied by the Court's recognition that evidence may be taken, sifted and analyzed by subordinates and that argument may be oral or written. *Id.* at 481, 56 S.Ct. at 911–12.

We are convinced that the procedures used in this case comply with the requirements enunciated in *Morgan.* Notice was given to the parties, a hearing was held, and the parties were able to present evidence and respond. The only issue, therefore, is whether the commissioners considered the evidence in making their decision. In this respect, Camesa has failed to allege or show that any of the commissioners failed to consider the evidence. Indeed, Camesa only claims that the absence of two of the commissioners from the hearing necessarily makes the hearing deficient. For the reasons discussed above, we are unable to conclude that the Commission's procedures for the conduct of the hearing were inadequate or that the absence of the two commissioners from part or all of the hearing precluded them from voting where, as here, it is clear that they fully considered the evidence in arriving at their decisions.

**B.**

Before antidumping duties are imposed, the Commission must determine that imported merchandise which is being sold, or which is likely to be sold, at less than fair value is materially injuring or threatening to materially injure domestic industry. 19 U.S.C. § 1673 (1988). Camesa challenges the Commission's affirmative material injury determination on the basis that the Commission's finding that the imported and domestic products compete is not supported by substantial evidence. Camesa argues that the steel wire rope market is divided into two segments, one that prefers and purchases domestic product and another that prefers and purchases imported product. Camesa does not dispute the finding that the domestic and imported product are physically fungible, but contends that the market share of the domestic and imported product shows they are not commercially fungible. Camesa notes that during 1987 through 1992 the domestic industry maintained 60% of the market, while consistently charging 30% higher prices, and that the domestic industry did not lose market share as a result of the lower priced imports and did not lower their prices to meet the price of the imports. It also notes that domestic producers imported steel wire rope and sold it at significantly lower prices than their own domestically produced steel wire rope. Camesa views these facts as establishing that there are two separate market segments for steel wire rope that do not compete with each other and, as a result, the domestic industry is not materially injured by the imports.

■ Although Camesa's market analysis based on these factors has appeal and standing alone might support its conclusion, the Commission's finding that the domestic industry was suffering material injury and that there was competition between the imported and domestic products is supported by other factors amounting to substantial evidence. Final Determination at 29 (views of Chairman Newquist, Vice Chairman Watson, and Commissioner Rohr).[4] The commissioners

---

**4.** Vice Chairman Watson issued separate views

on the issues of like product, domestic industry,

voting in the affirmative reached their conclusion that the domestic industry was suffering material injury because of the decline in the domestic industry's production, capacity utilization, net sales, and operating income from 1989–1991 and because of their further decline in 1992. *Id.* at 20. The commissioners also found that there was a "reasonable overlap" in competition between the subject imports and domestic product. *Id.* at 22.

In finding competition the commissioners pointed to evidence of lost sales and revenues. *Id.* at 18–19. They also cited, among other things, testimony that the imports into the United States market are often sold interchangeably; the responses of purchasers that the imports are employed in the same range of uses as the domestic products and that, as a result, they consider the products to be competitive; and evidence that price was the overwhelming factor in the purchasing decisions of a large number of end users, whereas quality and design differences were not a major factor. *Id.* at 30–31. In this connection, the commissioners noted that the differences between the products were not significant and, more specifically, that there were no real quality differences between the domestic and imported steel wire rope because of the industry specification standards that all steel wire rope must meet in the United States. *Id.* at 22, 30. Finally, as to competition between domestic and imported products, the commissioners cited evidence that sales of the products overlapped geographically and were made through the same channels of distribution. *Id.*

The Commission found other support for its affirmative injury determination as well. The Commission noted that there had been significant underselling by these imports. *Id.* at 28. Based on data compiled during the investigation, it found that during the period from 1989 to 1991, while other imports lost significant market share, the volume and market share of these imports increased as their unit values declined significantly. *Id.* at 28, 31. Also, the volume of domestic products was declining while domestic market share was increasing only marginally.

*Id.* at 28. The commissioners noted that these imports gained considerably more market share than domestic products during this period. *Id.* at 31. Based on this evidence, the Commission concluded that these imports gained domestic market share and that this could be attributed to their low price. *Id.* at 28. The low price of these imports prevented the domestic industry from gaining market share during this period. *Id.* at 31. The commissioners also cited a significant number of confirmed lost sales due to the low price of the imports. *Id.* From this the commissioners concluded that the volume and price of the unfairly traded imports had an adverse impact on production, sales, capacity utilization, and financial performance of domestic products. *Id.* at 31–32.

Although Camesa points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence. The Supreme Court has stated that under the substantial evidence standard two inconsistent conclusions could be adequately supported. *See Consolo v. Federal Maritime Comm.,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"). Either of such inconsistent conclusions would, therefore, have to be upheld on appeal. An appellate court is not the initial decision maker, and thus cannot substitute its judgment for that of the fact finder if it is supported by substantial evidence. Although in this case the dissenting commissioners' conclusions may be plausible, we are convinced that the Commission's affirmative injury determination is supported by substantial evidence.

## C.

As a final point, we consider Camesa's assertion that the Commission committed re-

---

and condition of the industry, but he joined with the views of Chairman Newquist and Commis-

sioner Rohr on all other issues. Final Determination at 16 n.53, 33.

versible error when it ignored the business cycle. It contends that the evidence shows that the industry was in a cyclical trough during the period from 1990–92, and that this down-turn in the industry explained why the domestic industry's overall performance had declined during that period. Given the context of the industry, Camesa asserts that the domestic industry was actually performing quite well.

■ In making a material determination, the Commission is required to evaluate relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). The commissioners voting in the affirmative explicitly acknowledged this requirement. They stated that "[n]o single factor is determinative, and the Commission considers all relevant factors 'within the context of the business cycle and conditions of competition that are distinctive to the affected industry.'" Final Determination at 15 (quoting 19 U.S.C. § 1677(7)(C)(iii)). While the commissioners did not make a specific finding concerning the effect of the business cycle, we have no reason to conclude that they ignored their own admonition. To the contrary, the commissioners voting in the affirmative all noted that the apparent consumption of steel wire rope in the United States had decreased during the period from 1989 to 1992. *Id.* at

16 (views of Chairman Newquist and Commissioner Rohr); *Id.* at 36 (views of Vice Chairman Watson). By finding that injury to the domestic industry was attributable to the unfairly traded imports, (and not attributing it to the declining fortunes of the steel wire rope industry), these commissioners implicitly rejected Camesa's business cycle argument. Under these circumstances, we are unable to conclude that the Commission ignored the context of the business cycle in making its determination.

## CONCLUSION

The final decision of the International Trade Commission, which found that the steel wire rope industry in the United States was materially injured during 1989–92 by imports from Korea and Mexico, was made in accordance with law and was based upon substantial evidence. Accordingly, we affirm the judgment of the Court of International Trade.

*AFFIRMED.*