**Slip Op. 99-57**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

TAIWAN SEMICONDUCTOR
INDUSTRY ASSOCIATION, ET AL.,

        Plaintiffs,

    and

MOTOROLA, INC.,

        Plaintiff-Intervenor,

    v.

UNITED STATES,

        Defendant,

    and

MICRON TECHNOLOGY, INC.

        Defendant-Intervenor.

</td><td>

BEFORE: Pogue, Judge

Court No. 98-05-01460

**Public Version**

</td></tr>
</table>

[The International Trade Commission's affirmative material injury determination is remanded.]

Decided: June 30, 1999

White & Case, LLP (Christopher F. Corr, Richard G. King, and Amy E. Farrell) for Plaintiffs.

Covington & Burling (Harvey M. Applebaum) for Plaintiff-Intervenor.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Michael Diehl, Office of the General Counsel, U.S. International Trade Commission, for Defendant.

Hale and Dorr LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz) for Defendant-Intervenor.


## OPINION

**POGUE, Judge:** This action is before the Court on Plaintiffs'

motion for judgment on the agency record pursuant to USCIT Rule 56.2. Taiwan Semiconductor Industry Association; Taiwan Semiconductor Manufacturing Company, Ltd.; Winbond Electronics Corporation; Alliance Semiconductor Corporation; Galvantech, Inc.; and Integrated Silicon Solution, Inc. (collectively, "Plaintiffs") seek review of the final determination of the U.S. International Trade Commission ("Commission") in Static Random Access Memory Semiconductors from the Republic of Korea and Taiwan, Inv. Nos. 731-TA-761 & 762 (Final)(List 2, Doc. 395)(Apr. 9, 1998)("Final Determination").[1] Specifically, Plaintiffs challenge the Commission's determination that the industry in the United States producing static random access memory semiconductors ("SRAMs") is materially injured by reason of imports from Taiwan that are sold at less than fair value ("LTFV"). The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).

## Background

SRAMs are integrated circuits containing thousands or millions of cells that allow data to be stored and retrieved at high speeds. Unlike dynamic random access memory semiconductors ("DRAMs"), SRAMs are capable of retaining their information without the need for periodic electrical "refresh," and therefore, they generally consume less power than DRAMs. Moreover, SRAMs are more complex in

---

[1] List 1 consists of the documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record.

design than DRAMs and are more difficult to manufacture. SRAMs come in a variety of sizes, process technologies, classifications, designs, and access speeds, and have two basic uses, serving as: 1) main memory in such products as hand-held cellular phones, portable computers, fax copiers, and modems, and 2) intermediate--or "cache"--memory in computer systems.

On February 25, 1997, Micron Technology filed a petition with the Commission and the Department of Commerce alleging that an industry in the United States was materially injured or threatened with material injury by reason of LTFV SRAMs imported from Korea and Taiwan. The Department of Commerce found that the Korean and Taiwanese SRAMs were being sold in the United States at LTFV. See Static Random Access Memory Semiconductors From the Republic of Korea, 63 Fed. Reg. 8,934 (Dep't Commerce, Feb. 23, 1998)(final determ.); Static Random Access Memory Semiconductors From Taiwan, 63 Fed. Reg. 8,909, 8,910 (Dep't Commerce, Feb. 23, 1998)(final determ.). Thereafter, the Commission made a negative material injury determination concerning the Korean imports and an affirmative material injury determination regarding the Taiwanese imports. See Final Determination at 3.

Only two commissioners participated in the final injury determination regarding SRAMs from Taiwan. See Final Determination at 33, n.168. Vice-Chairman Lynn M. Bragg found that the U.S. industry was materially injured by LTFV imports of SRAMs from Taiwan, with Chairman Marcia E. Miller dissenting. Vice-Chairman

Bragg's decision was deemed to be an affirmative determination of the Commission pursuant to section 771(11) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(11)(1994). Thus, hereafter, the Court will simply refer to Vice-Chairman Bragg's decision as the Commission's determination.

In sum, the Commission found that a price collapse caused material injury to the U.S. SRAM industry, and that "the subject imports from Taiwan contributed to and exacerbated the price collapse to a significant degree[.]" Final Determination at 37.

## Standard of Review

In reviewing the Commission's determination, the Court must sustain a final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

## Discussion

### A. Material Injury "By Reason Of" LTFV Imports

The statute directs the Commission to "make a final determination of whether . . . an industry in the United States . . . is materially injured . . . by reason of [the subject] imports[.]" 19 U.S.C. § 1673d(b)(1994). In Gerald Metals, Inc. v. United States, 132 F.3d 716 (Fed. Cir. 1997), the Court of Appeals for the Federal Circuit ("Federal Circuit") held that the "by reason of" standard "mandates a showing of causal--not merely

temporal--connection between the [subject imports] and the material injury."   132 F.3d at 720.   The standard "requires adequate evidence to show that the harm occurred 'by reason of' the [subject] imports, not by reason of a minimal or tangential contribution to material harm . . . ."  Id. at 722.

In examining the causal nexus between the subject imports and the material injury, the Commission is required by 19 U.S.C. § 1677(7)(B) to consider three factors: "1) the volume of [the subject] imports, 2) the effect of [the subject] imports on prices of like domestic products, and 3) the impact of [the subject] imports on domestic producers of like products."  USX Corp. v. United states, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).[2]

The Commission evaluates the volume and price effects of the subject imports and their consequent impact on the domestic industry by applying the standards set forth in 19 U.S.C. § 1677(7)(C).[3]  See U.S. Steel Group v. United States, 96 F.3d 1352,

---

[2]In addition, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  19 U.S.C. § 1677(7)(B)(ii)(1994).

[3]The relevant portions state:

> (i) Volume

> In evaluating the volume of imports of merchandise, the
> Commission shall consider whether the volume of imports
> of the merchandise, or any increase in that volume,
> either in absolute terms or relative to production or

consumption in the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether-
 (I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and
 (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) Impact on affected domestic industry

In examining the impact required to be considered under subparagraph (B)(i)(iii), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to-
 (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
 (II) factors affecting domestic prices,
 (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
 (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to

1360 (Fed. Cir. 1996); see also Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (Antidumping) at Art. 3.1 ("Antidumping Agreement")("A determination of injury . . . shall . . . involve an objective examination of both (a) the volume of the dumped imports and the effect of the dumped imports on prices in the domestic market for like products, and (b) the consequent impact of these imports on domestic producers of such products.").

More specifically, the statute directs the Commission to evaluate: 1) whether the volume of the subject imports is significant; 2) whether price underselling by the subject imports is significant and whether domestic price depression or suppression caused by the subject imports is significant; and 3) the impact on the domestic industry. See 19 U.S.C. § 1677(7)(C). In assessing the third factor, impact, the Commission evaluates the bearing of the volume and price effects on the domestic industry, see, e.g.,

_____

develop a
                    derivative or more advanced version of the
                    domestic like product, and
                    (V) in a proceeding under subtitle B[19 U.S.C.
§§
                    1673-1673h], the magnitude of the margin of
                    dumping.

          The Commission shall evaluate all relevant economic
          factors described in this clause within the context
of
          the business cycle and conditions of competition
that
          are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C).

Timken Co. v. United States, 20 CIT 76, 89, 913 F. Supp. 580, 591
(1996), and routinely determines whether the adverse impact is
significant as well.  See, e.g., Angus Chemical Co. v. United
States, 140 F.3d 1478, 1482 (Fed. Cir. 1998).

Thus, after assessing whether the volume, price effects, and
impact of the subject imports on the domestic industry are
significant,[4] the statutory "by reason of" language implicitly
requires the Commission to "determine whether these factors as a
whole indicate that the [subject] imports themselves made a
material contribution to the injury." Gerald Metals, Inc. v.
United States, 22 CIT ___, ___ 27 F. Supp.2d 1351, 1355 (1998),
appeal dismissed for appellant's failure to prosecute in accordance
with Federal Circuit Rule 31(a), No. 99-1166 (Fed. Cir. Apr. 16,
1999);[5] cf. U.S. Steel Group v. United States, 18 CIT 1190, 1211-
12, 873 F. Supp. 673, 694 (1994)(declining to extend the causation
test propagated by the court in British Steel Corp. v. United
States, 8 CIT 86, 593 F. Supp. 504 (1984), which held that "[t]he

---

[4]The Court notes that the presence or absence of any factor
is not dispositive to a finding of material injury.  See 19
U.S.C. § 1677(7)(E)(ii).  Moreover, the Commission has discretion
to weigh the significance of each factor in light of the
circumstances.  See Iwatsu Electric Co., Ltd. v. United States,
15 CIT 44, 49, 758 F. Supp. 1506, 1510-11 (1991).

[5]Following the Federal Circuit's decision in Gerald Metals,
132 F.3d 716, this Court ordered the Commission to reconsider its
affirmative material injury determination concerning imports of
pure magnesium from the Ukraine.  See Gerald Metals, 22 CIT ___,
slip op. 98-56 (April 28, 1998).  This Court then sustained the
Commission's subsequent remand determination in Gerald Metals, 22
CIT ___, 27 F. Supp.2d 1351 (1998).

statute's causation prerequisite to an affirmative determination is satisfied if the . . . imports contribute, even minimally, to the conditions of the domestic industry[.]" 8 CIT at 96, 593 F. Supp. at 413), aff'd, 96 F.3d 1352 (Fed. Cir. 1996). But see Grupo Industrial Camesa v. United States, 18 CIT 461, 465, 853 F. Supp. 440, 444 (1994)(relying on British Steel's minimal contribution test), aff'd, 85 F.3d 1577 (Fed. Cir. 1996); Pasco Terminals, Inc. v. United States, 83 Cust. Ct. 65, 88, 477 F. Supp. 201, 220-21 (1979)(holding that it was sufficient that the subject imports "contributed to the general depression of prices and to market disruption"), aff'd, 634 F.2d 610 (C.C.P.A. 1980).[6]

---

[6]The Federal Circuit's opinion in Gerald Metals was not *en banc*. The Court recognizes the general rule that, where there is "an apparent conflict in statements of Federal Circuit law, the earlier statement prevails unless or until it has been overruled in banc [sic]." YBM Magnex, Inc. v. Int'l Trade Comm'n, 145 F.3d 1317, 1319 n.2 (Fed. Cir. 1998)(citation omitted). Nevertheless, while the Federal Circuit in Camesa and its predecessor in Pasco affirmed lower court decisions that applied a minimal contribution requirement, neither court itself expressed an endorsement of such a standard. See Camesa, 85 F.3d 1577; Pasco, 634 F.2d 610. In fact, in Camesa, the Federal Circuit implies the opposite. See Camesa, 85 F.3d at 1581 (stating that "the Commission must determine that imported merchandise which is being sold . . . at less than fair value is materially injuring . . . [the] domestic industry")(emphasis added). While a Federal Circuit decision that is not *en banc* cannot change the law as established in prior rulings, "[s]ubsequent panel opinions may elaborate and refine and thus advance the evolution of judge-made law[.]" YBM Magnex, 145 F.3d at 1319 n.2. The Federal Circuit in Gerald Metals clarified that "the statute requires adequate evidence to show that the harm occurred 'by reason of' the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods." Gerald Metals, 132 F.3d at 722.
        Moreover, the Court must be guided by language in the Statement of Administrative Action to the Uruguay Round Agreements Act directing the Commission to "examine other factors

"Therefore, proper adherence to the causation analysis incorporated in the statute prevents the Commission from finding material injury by reason of [the subject] imports where their contribution to the overall harm is *de minimis* (e.g., minimal or tangential)."  Gerald Metals, 22 CIT at ___, 27 F. Supp.2d at 1356.[7]

Although in Gerald Metals this Court specifically interpreted the statute as it existed prior to the enactment of the Uruguay Round Agreements Act ("URAA") on January 1, 1995, this Court has

_____

to ensure that it is not attributing injury from other sources to the subject imports."  Statement of Administrative Action, H.R. Doc. No. 316, 103rd Cong., 2nd Sess. (1994), reprinted in Uruguay Round Agreements Act, Legislative History, Vol. VI, at 852 ("SAA").  See discussion infra pp. 10-11.
        The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . ."  SAA at 656.  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id. (quoted in Delverde, SrL v. United States, 21 CIT ___, ___, 989 F. Supp. 218, 229-30 n.18 (1997)).

        [7]The Court here is not endorsing a "magic words analysis." It is a well recognized principle of administrative law that "[a] court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Ceramica Regiomontana, S.A. v. United States, 5 Fed. Cir. (T) 77, 78, 810 F.2d 1137, 1139 (1987)(quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)). Moreover, the Court notes that the antidumping statute on its face does not compel a single method for analyzing causation, so long as its requirements are met.  See Gerald Metals, 22 CIT at ___, 27 F. Supp.2d at 1357.  Rather, while the Commission does not need to articulate a causation standard, the Court must nevertheless be able to reasonably discern that the Commission applied the "by reason of" analysis mandated by the statute.  Cf. Trent Tube Div. v. United States, 14 CIT 386, 398-99, 741 F. Supp. 921, 932 (1990), aff'd, 975 F.2d 807, 814 (Fed. Cir. 1992).

deemed that the "by reason of" standard articulated therein is applicable to the amended statute.  See NEC Corp. v. Dep't of Commerce, 22 CIT ___, ___, 36 F. Supp.2d 380, 391-93 (1998); Goss Graphics System, Inc. v. United States, 22 CIT ___, ___, 33 F. Supp.2d 1082, 1089-90 (1998), appeal docketed, No. 99-1150 (Fed. Cir. Dec. 11, 1998).  The URAA did not change the relevant statutory language, and the Statement of Administrative Action to the URAA expressly states that the causation analysis under the old statute is consistent with the URAA.  See SAA at 851.  Therefore, the "by reason of" standard applies under the URAA.

Moreover, the plain language of the SAA is consistent with this Court's holding in Gerald Metals that the Commission must determine whether the statutory factors as a whole indicate that the subject imports themselves made a material contribution to the overall injury. See SAA at 851-52.  The SAA clarifies that "the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Id. (emphasis added).

This new language mirrors the Antidumping Agreement as revised during the Uruguay Round of GATT negotiations.[8]  The previous

_____

[8]The previous legislative history to the U.S. antidumping statute also acknowledged that the Commission would consider other sources of injury, but was somewhat softer in tone.  See S. Rep. No. 96-249, 96th Cong., 1st Sess. at 75 ("Of course, in examining the overall injury to a domestic industry, the [Commission] will consider information which indicates that harm is caused by factors other than the less-than-fair-value imports."); H. Rep. No. 96-317, 96th Cong., 1st Sess. at 47 ("Of course, in examining the overall injury being experienced by a

antidumping agreement, finalized during the Tokyo Round, stated, "There may be other factors which at the same time are injuring the industry, and the injuries caused by other factors must not be attributed to the dumped imports." Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (Revised Antidumping Code)(1980) at Art 3.4. The current antidumping agreement more specifically directs that, when evaluating the volume effects, price effects, and impact of the subject imports, "[t]he authorities <u>shall</u> also examine any known factors other than the dumped imports which at the same time are injuring the domestic industry, and the injuries caused by these other factors must not be attributed to the dumped imports." Antidumping Agreement at Art. 3.5 (emphasis added).[9]

_____

domestic industry, the [Commission] will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the . . . dumped imports is attributable to such other factors.").

    [9]The Court notes that, in this regard, "the Commission need not isolate the injury caused by other factors from injury caused by unfair imports[,]" so long as it conducts an examination sufficient "to ensure that it is not attributing injury from other sources to the subject imports." SAA at 851-52. The GATT 1947 Panel Report in the Norwegian Salmon case, which the SAA endorses as illustrative of a proper causation analysis, sheds light on what is meant by "isolat[ing] the injury caused by other factors." <u>See</u> GATT Committee on Anti-dumping Practices, Imposition of Anti-dumping Duties on Imports of Fresh and Chilled Atlantic Salmon from Norway, Apr. 27, 1994, GATT B.I.S.D. (41st Supp.) at 421-23 (1994) ("<u>Norwegian Salmon</u>"). In <u>Norwegian Salmon</u>, the GATT panel indicated that the Commission need not identify the precise extent of injury caused by other factors (i.e., isolate the injury caused by other factors) in fulfilling the requirement not to attribute injuries caused by other factors to the subject imports. <u>See id.</u>

The Defendant makes two arguments concerning the application of this Court's opinion in <u>Gerald Metals</u> that merit attention.

In its brief, the Defendant argues that,

> This Court's statement in its <u>Gerald Metals</u> opinion that the [Commission] must examine whether other factors "dilute" the effects of [the subject] imports is consonant with the SAA insofar as the Court means that the [Commission] should examine whether other factors may "account for" the harm apparently due to [the subject] imports. The Court did not state, as Plaintiffs here urge, that other factors may render the impact of [the subject] imports insignificant simply because they may be more important. Such a rule would be directly contrary to the SAA.

Def.'s Opp'n to Pl.'s Mot. for J. Agency R. ("Def.'s Br.") at 11. In short, the Defendant argues that the "by reason of" standard does not require the Commission to weigh the effects of the subject imports against the effects of other causes of injury. The Defendant defines the weighing of causes as "determining whether the injurious effect of the subject imports is greater or lesser than the injurious effect of other factors[.]" <u>Id.</u> n.8.

As support for its contention, the Defendant notes the SAA's citation to page forty-seven of the House Report to the Trade Agreements Act of 1979. <u>See id.</u> (citing SAA at 885). The report states that,

> The law does not . . . contemplate that injury from [the subject] imports be weighted against other factors . . . which may be contributing to overall injury to an industry. Any such requirement has the undesirable result of making relief more difficult to obtain for those industries facing difficulties from a variety of sources, precisely those industries that are most vulnerable to subsidized or dumped imports.

H. Rep. No. 96-317, 96th Cong., 1st Sess. at 47 (1979).

The House report's admonition against the weighing of causes also appears nearly verbatim in the Senate Report to the Trade Agreements Act of 1979. See S. Rep. No. 96-249, 96th Cong., 1st Sess. at 74 (1979). As this Court previously noted, the Federal Circuit declined to endorse that Senate report's instruction not to weigh causes. See Gerald Metals, 22 CIT at ___, 27 F. Supp.2d at 1356, n.8 (citing Gerald Metals, 132 F.3d at 722). The Defendant argues that, because the SAA specifically refers to the House Report to the Trade Agreements Act of 1979, the Federal Circuit's declining to adopt the 1979 Senate report's admonition against weighing causes only applies to pre-URAA cases. See Def.'s Br. at 11 n.8.

The Court first notes that the SAA refers to the 1979 House report in the section discussing the standard for determining the likelihood of continuation or recurrence of material injury under 19 U.S.C. § 1675a (1994), not in the section discussing the material injury determination under 19 U.S.C. § 1673d(b). See SAA at 885. Moreover, the SAA specifically states that "[t]he likelihood of continuation or recurrence of material injury standard is not the same as the standards for material injury and threat of material injury, although it contains some of the same elements." See id. at 883.

Furthermore, the "by reason of" standard is consistent with a requirement not to weigh causes contributing to overall injury. In Gerald Metals, the Federal Circuit did not specifically contravene

the 1979 Senate report's admonition against weighing causes. Rather, the court declined to interpret the report as authorizing an affirmative injury determination supported merely "by reason of a minimal or tangential contribution to material harm caused by LTFV goods." Gerald Metals, 132 F.3d at 722. Subsequently, this Court clarified that the "by reason of" standard requires the Commission to determine whether the statutory factors as a whole indicate that the subject imports themselves made a material contribution to the overall injury. See Gerald Metals, 22 CIT at ___, 27 F. Supp.2d at 1355. That the injurious effects from other sources may be greater than the effect of the subject imports is not determinative, so long as the Commission reasonably finds that the subject imports' contribution to the overall harm is material. Therefore, the Commission need not weigh (i.e., determine which is greater or lesser) causes in complying with the "by reason of" standard.

As noted above, however, it is paramount in this regard that the Commission "examine other factors to ensure that it is not attributing injury from other sources to the subject imports." SAA at 851-52. Especially where the Commission finds one main cause of injury to the domestic industry, this analysis inherently necessitates some degree of comparison between the injurious effects of the subject imports and other unrelated factors because, in some cases, other sources of injury "may have such a predominant effect in producing the harm as to . . . prevent the [subject]

imports from being a material factor."  See Gerald Metals, 22 CIT

at ___, 27 F. Supp.2d at 1356 n.8.[10]

        Finally, Gerald Metals is not, as the Defendant contends,

limited to the particular facts of that case.  See NEC, 22 CIT at

___, 36 F. Supp.2d at 391-93; Goss Graphics System, 22 CIT at ___,

33 F. Supp.2d at 1089-90.  Gerald Metals clarifies that, in any

case, the Commission must determine whether the statutory factors

as a whole indicate that the subject imports themselves made a

material contribution to the injury to comply with the "by reason

of" standard.  See Gerald Metals, 22 CIT at  ___, 27 F. Supp.2d at

1355.  Where other sources of injury are known, the Commission must

conduct some examination to ensure that it does not attribute the

harmful effects from the other factors to the subject imports.  See

SAA at 852.

_____

        [10]In this regard, the Court again notes the SAA's
endorsement of Norwegian Salmon.  See SAA at 851.  In that case,
the Commission had found that, "'[a]lthough other factors may
have contributed, the decline in U.S. prices for Atlantic salmon
in 1988 and 1989 was due in large part to oversupply in the U.S.
market.'" Norwegian Salmon at 423.  In reviewing the Commission's
determination, the GATT panel held that,

        When the amount of the increase in absolute import
        volume from Norway from 1987 to 1989 was compared to
        the amount of the increase in absolute import volume
        from other supplying countries, it could not . . .
        reasonably be found that the [Commission] had
        attributed to the Norwegian imports effects entirely
        caused from other supplying countries.

Id. (emphasis added).  As was necessary under the circumstances,
the Commission compared the volumes of the subject imports and
non-subject imports in examining whether it had attributed injury
from the non-subject imports to the subject imports.

**B.  Volume Effects**

In analyzing causation, the statute requires the Commission to determine, among other things, "whether the volume of [the subject imports], or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  Here, the Commission found that the absolute increase in volume of SRAMs from Taiwan in the United States was "nearly threefold[,]" and therefore, significant.  See Final Determination at 33-34.  Substantial evidence supports the Commission's conclusion. See Staff Report at IV-7, Table IV-3.

The Court cannot, however, without more, sustain the Commission's additional conclusion that the subject imports' increase relative to U.S. consumption was significant.  First, as U.S. consumption also increased during the period of investigation, the subject imports' increase relative to U.S. consumption was relatively small. See id. at IV-7, Table IV-3.  From 1994 to 1997, the period of investigation, the subject imports' market share increased by just over 2%. See id. at IV-9, Table IV-4.

Non-subject imports of SRAMs, however, in terms of both absolute and relative increases in volume, greatly exceeded the imports of Taiwanese SRAMs.[11]  See id. at IV-7, Table IV-3, and at IV-9, Table IV-4.  Moreover, the non-subject imports were

---

[11]The non-subject imports include both non-subject Korean imports and third-country imports.

recognized as a potential source of injury to the domestic industry.   See Final Determination at 23-24.   Although the Commission did not discuss the substantial presence of the non-subject imports in its discussion of the Taiwanese imports' volume effects, it did acknowledge their "growing volume" in its analysis of the impact of the subject imports.   See id. at 37.

The Court recognizes that the Commission has discretion to weigh the significance of each factor in light of the circumstances.   See Iwatsu, 15 CIT at 49, 758 F. Supp. at 1510-11. Nevertheless, without an explanation of how the relatively small volume of Taiwanese imports was significant given the dominant presence of non-subject imports, the Court cannot review the Commission's implicit determination that it did not attribute injury from the non-subject imports to the subject imports.   See SAA at 851-52; see also Norwegian Salmon at 408 (finding that the Commission did not commit errors of fact because it "consider[ed] all information and . . . explain[ed] why [contradictory] data . . . did not detract from a finding of a significant increase in the volume of imports").   Thus, it appears that the Commission "failed to articulate a 'rational connection between the facts found and the choice made.'"   Bando Chemical Industries, Ltd. v. United States, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992)(quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)), aff'd, 26 F.3d 139 (Fed. Cir. 1994).

Therefore, the Court cannot conclude that the Commission's determination that the increase in volume of the subject imports was significant is supported by substantial evidence absent an explanation of how they are significant in light of the dominant presence of non-subject imports.[12]

## C.  Price Effects

The statute provides that, in evaluating the effect of the subject imports on domestic prices,

> [T]he Commission shall consider whether--(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

---

[12]The Defendant argues that "[t]he statute does not direct the [Commission] to evaluate the significance of the volume of subject imports relative to the volume of non-subject imports." Def.'s Br. at 14.  The plain language of the statute, however, instructs the Commission to consider whether the volume of the subject imports is significant either in absolute or relative terms.  19 U.S.C. § 1677(7)(C)(i).  Here, the Commission considered both.  In evaluating the relative significance of the subject imports, the statute instructs the Commission to consider their volume "relative to production or consumption in the United States[.]"  19 U.S.C. § 1677(7)(C)(i)(emphasis added).  Where non-subject imports are consumed in the United States, they inherently comprise a portion of consumption in the United States.  Moreover, in Norwegian Salmon, the panel specifically compared the volume of the subject imports relative to the volume of the non-subject imports.  See Norwegian Salmon at 423.  The need to explain the significance of the subject imports' volume in light of a substantially greater volume of non-subject imports is especially acute where, as here, the non-subject imports are a potential source of the injury.  See Final Determination at 23-24.

The Commission first noted that, in the SRAM market, "price is a critical factor in purchasing decisions."  Final Determination at 34.  The Commission further explained that,

> In such a market, significant underselling by significant and increasing volumes of imports can have a dramatic effect on prices for the domestic like product.  The record in this investigation demonstrates that the large and increasing volume of LTFV imports from Taiwan undersold the domestic like product in 161 of 213, or 76 percent of possible price comparisons, at average underselling margins of 21.5 percent.  While some of the underselling turned to overselling during 1996 and 1997 for products 3 and 5,[13] Taiwanese imports consistently undersold the domestic product in products 1 and 2. These more recently developed products accounted for a significant percentage of Taiwanese shipments during the latter part of the period of investigation.

Id. at 34-35.

The record confirms that the subject imports undersold the domestic SRAMs in 161 of 213 comparisons by an average margin of 21.5%.  See Staff Report at V-20.  Therefore, substantial evidence supports the conclusion that there was significant price underselling by the Taiwanese imports.

Without more, however, the Court cannot sustain the Commission's finding of a causal nexus between the underselling by Taiwanese SRAMs and the domestic price declines.  In sum, the Commission concluded that price declines in 1996 and 1997 were the main source of injury to the domestic industry, and that the subject imports contributed to the depression of domestic prices to a significant degree.  See Final Determination at 35, 37.  The

_____

[13]The Commission collected price information for six SRAM products, designating them products 1 through 6.

price declines, however, were also attributed to other known factors, the effects of which were not adequately explained by the Commission.  See id.

The Court first notes that the Commission found that the subject imports had significant price depressing effects despite the fact that the record indicates that during 1996 and 1997 the majority of the Taiwanese imports oversold the domestic product. As indicated in the above quote, the Commission emphasized the underselling during 1996-1997 by Taiwanese products 1 and 2.  See id. at 35.  Moreover, the Commission found that products 1 and 2 "accounted for a significant percentage of Taiwanese shipments during the latter part of the period of investigation."  Id. According to the Commission, "Product 1 accounted for [less than 25] percent of Taiwanese shipments in 1996 and [about 10] percent in 1997, and product 2 accounted for [roughly 20] percent of Taiwanese shipments in 1997."  Id. at 35 n.177 (citing Staff Report at VI-7, Table IV-3, and at V-6 to V-8, Tables V-1 and V-2).

At oral argument on May 26, 1999, the parties explained how the percentage shares of Taiwanese subject imports were calculated for each of Taiwanese products 1 through 6 from tables in the Staff Report.  Tables V-1 through V-6 of the Staff Report provide the respective quantities of Taiwanese products 1 through 6 for each year of the period of investigation in terms of units.[14]  Meanwhile,

---

[14]A unit refers to one SRAM, a single semiconductor chip. See Staff Report at I-7.

Table IV-3 of the Staff Report indicates the Taiwanese imports'
total volume for each year of the period of investigation expressed
in terms of billions of bits.[15]

As explained at oral argument, the Commission performed two
steps to calculate from record evidence the respective percentages
of total Taiwanese imports for each product.  First, the Commission
converted the respective quantities of Taiwanese products 1 through
6, provided in Tables V-1 through V-6 for each year of the period
of investigation, from units to billions of bits.  Next, the
Commission divided the yearly amount for each product obtained
above by the yearly total--in terms of billions of bits--for all
Taiwanese subject imports given in Table IV-3.  Therefore, the
Commission calculated the respective percentages of total Taiwanese
subject imports that each of products 1 through 6 constituted for
each year of the period of investigation in terms of billions of
bits.[16]

---

[15]SRAM size is measured in terms of density, expressed as
the number of storage cells, or bits, contained in a single chip.
See Staff Report at I-7.  SRAM products 1 through 6 vary in terms
of their densities.  Products 1, 3, and 4 each contain 1,048,576
bits.  See id. at I-7 n.15 and V-5.  A single SRAM of product 2
contains 2,097,152 bits, and products 5 and 6 each contain
262,144 bits.  See id.

[16]The Court notes, however, that the data from Table IV-3
and Tables V-1 through V-6 do not correspond.  Specifically, the
amounts for products 1 through 6 from Tables V-1 through V-6,
when added together to arrive at the yearly totals and converted
to billions of bits, do not equal the yearly totals given in
Table IV-3.  Therefore, when the Commission divided each
individual product's quantity from Tables V-1 through V-6 by the
total Taiwanese imports from Table IV-3, it calculated inaccurate
percentages.  For example, Defendant's Exhibit 2, a chart

It is not self-evident to the Court, however, that the Commission's decision to analyze products 1 through 6 in terms of billions of bits in calculating the products' respective percentages of total Taiwanese imports is reasonable. The Commission itself defined SRAMs as follows: "SRAMs are integrated circuits containing thousands or millions of cells that allow data to be stored and retrieved at high speeds. SRAMs vary by access speed (the time required to access data, measured in nanoseconds), density (the number of storage cells), and power consumption." Final Determination at 5.

Specifically, it is not clear to the Court that the true significance of each product's relative volume can appropriately be evaluated in terms of billions of bits, which is a measure only of density (as distinguished from access speed and power consumption), instead of in terms of units of SRAMs themselves. As stated by the Commission, "significant underselling by significant and increasing volumes of imports can have a dramatic effect on prices for the domestic like product." Final Determination at 34. SRAMs are priced and sold by the unit. See Staff Report at V-6 through V-16, Tables V-1 through V-6, and at V-21 through V-28. By measuring each product's relative share of total subject imports in terms of billions of bits, however, the Commission seemingly evaluates the

presented to the Court at the May 26, 1999, oral argument to explain the evidentiary data, indicates that product 5 constituted [[     ]] of total Taiwanese subject imports in 1994. Because this number exceeds 100%, it is impossible.

comparative significance of each product's price effects, to some degree, in terms of density, rather than in terms of how the products are priced and shipped--by the unit.[17]

_____

[17]For example, in terms of SRAMs imported, Taiwanese product 5 dwarfed Taiwanese product 2 throughout the period of investigation.  See Staff Report at V-8, Table V-2, and at V-13 to V-14, Table V-5.  Product 2, however, contains eight times as many bits as product 5.  Therefore, because the product's relative share of total subject imports is assessed in terms of density, Taiwanese product 2 is attributed greater significance than it would have been accorded had it been evaluated in terms of units imported.  Where, as here, the Commission chooses to rely on the price effects of individual products within the category of subject merchandise, it seems their relative share of total subject imports should be evaluated in terms of how they are priced--by the unit--rather than in terms of their size.
     Upon calculating each product's percent share of total Taiwanese subject imports in terms of units, the record indicates that product 1 accounted for only about 10% of Taiwanese imports in 1996 and less than half of that figure in 1997.  See Staff Report at V-6 to V-16, Tables V-1 to V-6.  Product 2 accounted for a negligible percent of Taiwanese imports in 1996 and approximately 5% in 1997.  See id.  Their combined share of total subject imports was roughly 10% in 1996 and fell from that level in 1997.  See id.
     Meanwhile, as noted above, products 3 and 5 accounted for the great majority of the subject imports in 1996 and 1997.  See Staff Report at V-6 to V-16, Tables V-1 to V-6.  Based on the Court's calculations, products 3 and 5 together accounted for over 75% of Taiwanese shipments in 1996 and that share increased further in 1997 in terms of units.  See id.  Moreover, relative to total Taiwanese imports, the combined share of products 3 and 5 increased by 5-10% from 1996 to 1997, while the combined share of products 1 and 2 decreased slightly.  See id.
     These findings are important because, as the Commission noted, while Taiwanese products 1 and 2 consistently undersold the equivalent domestic products during 1996 and 1997, Taiwanese products 3 and 5 predominantly oversold the equivalent U.S. products during the same period.  See Final Determination at 35; see also Staff Report at V-20 (explaining that, while the average margin of underselling for Taiwanese imports over the entire period of investigation was 21.5%, "results were somewhat different for products 3 and 5, the largest volume products for both U.S. producers and Taiwan importers.  For these products, the U.S.-produced product was generally priced higher in 1994 and 1995 but the Taiwan product was generally priced higher in 1996

The Court recognizes, however, that "[i]t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985). Thus, despite the Court's misgivings, we cannot conclude that it is clearly unreasonable to measure the Taiwanese products' respective shares of total subject imports in terms of billions of bits.

As the Final Determination stands, the Commission found that products 1 and 2 accounted for less than 25% of Taiwanese shipments in 1996 and less than 33% in 1997. See Final Determination at 35 n.177. Meanwhile, using the Commission's methodology, products 3 and 5 accounted for more than 50% of Taiwanese shipments in 1996 and more than 67% in 1997. See Staff Report at IV-7, Table IV-3, at V-9 and V-10, Table V-3, and at V-13 and V-14, Table V-5. Thus, using the Commission's calculations, Taiwanese products 3 and 5, which generally oversold domestic products 3 and 5 during 1996-1997, see id. at V-9 and V-10, Table V-3, and at V-13 and V-14,

---

and 1997."), and at V-6 to V-16, Tables V-1 to V-6.

The Commission noted that the domestic "prices for SRAMs increased during the first half of 1995, then generally declined during the remainder of the period of investigation." Final Determination at 35. The subject imports, however, generally followed reverse trends. During 1994 and 1995, units of Taiwanese SRAMs predominantly undersold the domestic product, yet largely oversold the domestic product during the latter part of the investigation. See Staff Report at V-6 to V-16, Tables V-1 to V-6. Thus, when each product's relative share of total subject imports is evaluated in terms of units, the record appears to contradict the finding of a causal connection between the prices of Taiwanese imports and the domestic product.

Table V-5, constituted the majority of Taiwanese shipments during
1996-1997.

The Court notes, however, that the Commission has the
discretion to weigh the significance of each factor in light of the
circumstances.  See Iwatsu, 15 CIT at 49, 758 F. Supp. at 1510-11.
It may be reasonable to conclude that the Taiwanese imports had
significant price depressing effects in 1996-1997, despite the fact
the majority of the subject imports generally oversold the domestic
product during that period.

Here, however, the Commission failed to explain how it ensured
that it did not attribute the price depressing effects from other
known factors to the subject imports.  While acknowledging that
other factors, such as global oversupply, the learning curve, and
non-subject imports, played roles in the 1996-1997 price declines,[18]

_____

[18]The overall record discusses three other primary potential
sources of the domestic price decline: the learning curve effect,
global oversupply, and the presence of non-subject SRAMs in the
United States.  The learning curve is the phenomenon by which a
firm's manufacturing costs, and hence its prices, decrease as it
becomes more efficient in production.  See Final Determination at
22.  The record indicates that "SRAM prices historically show a
pattern of steep price declines as the products move along market
and production life cycles."  Staff Report at I-20 and V-1; see
also Final Determination at 22.
The record also discusses how the global SRAM market
experienced oversupply during 1996 and 1997.  See Staff Report at
II-4 and V-3; Final Determination at 23.  All participating
commissioners  agreed that the global oversupply contributed to
the domestic price declines.  See Final Determination at 23
("SRAM supply expanded and prices fell significantly (falling
below 1994 levels in the second half of 1996 and 1997).").  The
record indicates that the oversupply in SRAMs was due, in part,
to an inaccurate demand forecast.  See Staff Report at V-3.  In
early 1995, the industry expected demand for SRAMs to increase
dramatically.  Consequently, producers invested in developing

see Final Determination at 35, the Commission nevertheless concluded that "[t]he domestic industry's financial troubles [were] due in significant part to the price depressing effects of the subject imports from Taiwan on the domestic like product during the period of investigation."  Id. at 37 (emphasis added).

The Commission's determination, however, was conclusory. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."  SEC v. Chenery Corp., 318 U.S. 80, 94 (1943).  Although the Commission concluded that the subject imports themselves caused the domestic price declines to a

---

more factories and built up their inventories.  As the industry restricted supply, prices rose.  By the middle of 1996, however, it became evident that the industry had greatly overestimated the future demand for SRAMs.  Thus, as new factories came online and producers sold off inventories, oversupply resulted, causing price declines.  See id.; Final Determination at 23.

Finally, the overall record also indicates that the presence of non-subject imports in the United States potentially contributed to the price declines.  See Staff Report at II-13 ("Non-subject imports, most of which are from Samsung (Korea) and Japan account for a large share of the U.S. market for SRAMs."), at IV-7, Table IV-3, and at IV-9, Table IV-4.  All participating commissioners agreed that the presence of non-subject imports was an important condition of competition in the United States, stating:

> The fifth condition of competition is the presence in the U.S. market of non-subject imports.  The non-subject imports increased in market share during the period of investigation and were larger in volume than the subject imports. . . . Regarding the non-subject imports from Korea, which are the only non-subject imports for which pricing data are on the record, they both undersold and oversold the domestic like product, but generally were priced lower than the U.S. product.

Final Determination at 23-24.

"significant degree," it did not explain the basis for that conclusion given the extensive evidence of other known sources of injury.  Cf. Norwegian Salmon at 408.  Specifically, while the Commission acknowledged the price depressing effects of the global oversupply, the learning curve, and the non-subject imports, the Court cannot discern how it ensured that it did not attribute the harmful effects from these other factors to the subject imports.

Although the Commission is presumed to have made the requisite findings, the Court "must have a reviewable, reasoned basis." Bando Chemical, 16 CIT at 136, 787 F. Supp. at 227 (citing Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988)("In order to ascertain whether action is arbitrary, . . . reasons for the choices made among various potentially acceptable alternatives usually need to be explained.")); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-68 (1962).  Without such a reasoned basis, the Court is unable to sustain the Commission's implicit finding that the other sources of price decline did not "have such a predominant effect in producing the harm as to . . . prevent the [subject] imports from being a material factor." Gerald Metals, 22 CIT at ___, 27 F. Supp.2d at 1356 n.8.

## Conclusion

The Commission found that "[t]he domestic industry's financial troubles [were] due in significant part to the price depressing effects of the subject imports from Taiwan on the domestic like product[.]" Final Determination at 37. The Commission, however, must not attribute the harmful effects from other sources of injury to the subject imports and must adequately explain how it ensured not doing so. Therefore, the Commission's affirmative determination is remanded for reconsideration consistent with this Court's opinion.

The Commission shall complete its remand determination by **Monday, August 30, 1999**; any comments or responses are due by **Wednesday, September 29, 1999**; and any rebuttal comments are due by **Thursday, October 14, 1999**.

So Ordered.

_____
                                                    Donald C. Pogue
                                                    Judge


Decided:  June 30, 1999
          New York, New York