ARCHER, Senior Circuit Judge,
dissenting.
The majority states that Gerald Metals, 132 F.3d 716 (Fed.Cir.1997), “requires the Commission to explain why — notwithstanding the presence and significance of the non-subject imports' — -it concluded that the subject imports caused material injury to the domestic industry.” Maj. op. at 1375. While acknowledging that there may be support for the Commission’s ultimate determination of material injury in the record here, the majority “find[s] that the Commission did not sufficiently explain its decision in this regard.” Id. I disagree.
In my view, the Commission adequately considered the effect of both the subject imports and the interchangeable nonsubject imports on the domestic industry in its determination and found substantial evidence in the record to support its material injury determination. I would, therefore, affirm the Court of International Trade’s judgment sustaining the Commission.
*1377 The majority appears to take no issue with the Commission’s underlying analysis of whether the domestic industry was in fact harmed. The Commission performed the proper analysis and considered the statutorily enumerated factors. See 19 U.S.C. § 1677(7)(B)(i) (2000).[1] It concluded that the volume and increase in volume of subject imports, both in absolute terms and relative to apparent domestic consumption and production in the United States, supported a finding of material injury determination. The Commission found that 1) the quantity of subject imports increased overall by 35.8% from 1999 to 2001 and by 38.6% from 2000-2001 (after showing a slight decrease from 1999 to 2000); 2) “[t]he continued increase in subject import volume by 57.6 percent between the interim periods resulted in Russia being the largest single source of silicon metal imports in interim 2002”; and 3) from 1999 to 2001 and from 2000-2001 subject imports outpaced all other imports in gaining U.S. market share.
Given that “price is a key factor in purchasing decisions [to buy silicon metal]”, the Commission also concluded that underselling by subject imports supported a material injury determination, “find[ing] that prices have been depressed to a significant degree by the subject imports.” Although nonsubject goods have at times also undersold the domestic product, the Commission found that purchaser price data “show[s] that imports from Russia have been priced at lower levels than nonsubjeet imports.” Specifically, the Commission noted that imports from Russia undersold South African chemical grade product in all eleven purchaser price comparisons and undersold Brazilian chemical grade product in ten of eleven purchaser price comparisons. In its price analysis, the Commission “recognize[d] that nonsubject imports may have had an independent price depressive effect on domestic silicon metal prices.” Ultimately, however, the Commission concluded that
given the significant underselling by subject imports, subject import volume surges during the [period of interest], and the high degree of substitutability between subject imports and the domestic product, ... the subject imports themselves have significantly depressed domestic silicon metal prices in all three customer segments (ie., chemical, primary and secondary aluminum customers).
As part of its material injury determination, the Commission specifically addressed the respondents’ argument “that there was no causal nexus between subject imports and the injury suffered by the domestic industry because of the presence of interchangeable and readily available nonsubject imports.” The Commission found that “[s]ubject imports registered a 4.8 percentage point market share gain while nonsubject imports lost 2.3 percentage points in market share from 2000 to 2001, the same year that the domestic industry suffered an operating loss for the first time during the [period of interest] and idled, closed, or converted many of its silicon metal production facilities.” Specif *1378 ically, the Commission explained that Russian imports’ share of total imports increased from 7.3% in the first quarter of 2001 to 26.2%, 31.4%, and 40.1%, respectively, in the remaining three quarters of 2001. Similarly, Russian imports’ share of total imports was 31.5% in first quarter 2002 and 36.9% in second quarter 2002, before declining to 11.6% in third quarter 2002, following the Commission’s and the Department of Commerce’s preliminary determinations in this investigation. The Commission also observed that by quantity, nonsubject import volume increased only by 25.8% from interim 2001 to interim 2002, whereas subject import volume increased by 57.6% during the same period.
In view of this data, the Commission concluded that “the fact that nonsubject imports may have contributed to the domestic industry’s continued deterioration toward the end of the period, along with subject imports, does not negate our finding that subject imports themselves, had a material adverse impact on the domestic industry.” This is precisely the causation analysis necessary in view of Gerald Metals. Neither the statute nor Gerald Metals imposes the rigidity in findings or analysis that the majority seems to require. Indeed, the Gerald Metals opinion acknowledges the “unique circumstances” in that case. Gerald Metals, 132 F.3d at 722.
Contrary to the majority’s assertion, the Commission here did not “claim that it is not obligated to follow this court’s precedent.” Maj. op. at 1375. Rather, the Commission merely noted that Commission investigations are sui generis and, because of this, its prior investigations may not always form the basis for clear precedent that transcends different fact patterns. When explaining the factual differences between Gerald Metals (and other similar cases[2]) and the present case, the Commission found significant that in Gerald Metals subject import volume had decreased, both in absolute terms and relative to domestic consumption, during the last fall year of the period of interest. These volume trends, explained the Commission, indicated that the significance of LTFV imports diminished during the period of interest, thus suggesting that in Gerald Metals any injury to domestic injury was not by reason of the subject imports. Because of the factual differences between Gerald Metals and the present case, the Commission determined that “respondents’ arguments that Gerald Metals precludes an affirmative determination in this investigation [were] unpersuasive.”
As summarized above, the Commission performed a proper material injury analysis, including explaining why the subject imports caused material injury to the domestic industry despite the existence of interchangeable nonsubject imports. In fact, the Commission expressly acknowledged its obligation to consider the effect of nonsubject imports in its investigation, citing Gerald Metals and Taiwan Semiconductors:
We have considered the evidence on nonsubject imports in this investigation *1379 and find, notwithstanding the presence of nonsubject imports, that subject imports themselves caused material injury to the domestic industry and did not simply contribute to the injury in a “tangential or minimal way.” Gerald Metals, 132 F.3d at 722; Taiwan Semiconductors Industry Ass’n v. Int'l Trade Comm’n, 266 F.3d 1339, 1344 (Fed.Cir.2001).
I fail to see what more the Commission should be required to do to explain its decision.

. Section 1677(7)(B)(i) of Title 19 of the United States Code states that in making a material injuiy determination the Commission must consider the following factors:
(I) the volume of imports of the subject merchandise,
(II) the effect of imports of that merchandise on prices in the United States for domestic and like products, and
(III)the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States....
19 U.S.C. § 1677(7)(B)(i).

. For example, in discussing Taiwan Semiconductors Industry Ass’n v. Int’l Trade Comm’n, 266 F.3d 1339 (Fed.Cir.2001), the Commission noted that this court had affirmed the ■ Commission's redetermination. There the Commission found that, throughout the period of investigation, Taiwanese Static Random Access Memory Semiconductor ("SRAMS”) market share, both by value and by quantity, had remained relatively flat. The domestic industry's market share, by quantity, declined by about 15% while the market share of nonsubject imports increased by almost that amount. During the years in which the domestic industry suffered its greatest injury, imports from Taiwan frequently oversold U.S. product. Thus, the Commission was simply noting the clear difference between the fact pattern present in Taiwan Semiconductors and the one before it.