266 F.3d 1339 (Fed. Cir. 2001)
 TAIWAN SEMICONDUCTOR INDUSTRY ASSOCIATION,TAIWAN SEMICONDUCTOR MANUFACTURING COMPANY, LTD., WINBOND ELECTRONICS CORPORATION,
ALLIANCE SEMICONDUCTOR CORPORATION, GALVANTECH, INC., and INTEGRATED SILICON SOLUTION, INC., Plaintiffs-Appellees,
and
MOTOROLA, INC., Plaintiff,
v.
INTERNATIONAL TRADE COMISSION, Defendant-Appellee,
v.
MICRON TECHNOLOGY, INC., Defendant-Appellant.
 No. 01-1060
 United States Court of Appeals for the Federal Circuit
 DECIDED: September 21, 2001
 
 Appealed from: United States Court of International Trade Judge Donald C. PogueChristopher F. Corr, White & Case, LLP, of Washington, DC, argued for plaintiffs-appellees. Of counsel was Lyle B. Vander Schaaf.
 Michael Diehl, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant-appellee. With him on the brief were Lyn M. Schlitt, General Counsel; and Marc A. Bernstein, Acting Assistant General Counsel. Of counsel was James A. Toupin, Attorney.
 Gilbert B. Kaplan, Hale and Dorr, LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael D. Esch, Paul W. Jameson, and Cris R. Revaz.
 Before RADER, BRYSON, and DYK, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 During its first investigation, the International Trade Commission found that Taiwanese imports of static random access memory chips (SRAMs) at less than fair value (LTFV) injured the domestic industry. Static Random Access Memory Semiconductors From Taiwan, 63 Fed. Reg. 8,909, 8,910 (Dep't Commerce, Feb. 23, 1998) (final determ.) (Commissioner Miller dissenting) (First Determination). On review, the United States Court of International Trade neither affirmed nor reversed. Rather, the court remanded the Commission's determination for the Commission to explain the causal nexus between LTFV Taiwanese imports and domestic price declines in light of the dominant presence of non-subject imports. Taiwan Semiconductor Indus. Assoc. v. United States, 59 F. Supp. 2d 1324 (Ct. Int'l Trade 1999) (Taiwan I). Because the Court of International Trade did not abuse its discretion in requesting clarification from the Commission, this court affirms the Court of International Trade's initial remand.
 
 
 2
 On remand, the Commission again found that Taiwanese imports of SRAMs at LTFV injured domestic industry. Commission's Determ. on Remand (List 2, Doc. 406) (Aug. 30, 1999). The Court of International Trade again neither affirmed nor reversed. The court remanded the Commission's determination for more explanation on two issues relating to price depression and lost revenues. Taiwan Semiconductor Indus. Assoc. v. United States, 93 F. Supp. 2d 1283 (Ct. Int'l Trade 2000) (Taiwan II). On the second remand, the Commission determined that there was no material injury, or threat thereof, to the domestic industry by reason of imported Taiwanese SRAMs. Commission's Determ. on Remand (List 2, Doc. 411) (June 23, 2000) (Redetermination). The Court of International Trade affirmed the Commission's negative material injury determination. Taiwan Semiconductor Indus. Assoc. v. United States, 118 F. Supp. 2d 1250 (Ct. Int'l Trade 2000) (Taiwan III). Because the record contains substantial evidence that factors other than LTFV Taiwanese imports caused the material injury to domestic industry, this court affirms.
 
 I.
 
 3
 SRAMs are integrated circuits that allow data to be digitally stored and retrieved at high speed. SRAMs come in a variety of sizes, process technologies, access speeds, and densities. Slower speed SRAMs serve as memory in products such as cellular telephones, pagers, and modems. Higher speed SRAMs serve as intermediate, or cache, memory in various computer systems such as workstations and servers. High speed SRAMs generally sell for premium prices.
 
 
 4
 The SRAM industry is highly cyclical, with short product life cycles. Suppliers sell SRAMs with new and improved features at high margins until competitors match the features. As competitors introduce SRAMs with similar features on the market, the improved SRAM declines in price. Between the years 1994 and 1997, the number of suppliers selling SRAMs in the United States market increased. In that same timeframe, the amount of SRAM manufacturing capacity increased worldwide, particularly during 1996. Also during that same timeframe, SRAM prices on the United States market declined and the United States SRAM industry fell from profitability into steep losses. Thus, as the parties to this litigation do not dispute, the United States SRAM industry experienced material injury, particularly in 1996 and 1997.
 
 
 5
 In 1997, Micron Technology, Inc. filed an antidumping petition against imports of SRAMs from the Republic of Korea and Taiwan under section 773 of the Tariff Act of 1930, codified as amended at 19 U.S.C. 1677 (1994). The Commission examined six SRAM products in its investigation. After soliciting comments from all parties, the Commission aggregated all six products for purposes of volume analysis. The Commission's examination was, therefore, based on a single product consisting of all SRAMs.
 
 
 6
 At the time of final determination, the Commission consisted of three sitting Commissioners. One of the three Commissioners, Crawford, recused herself. The two other Commissioners, Bragg and Miller, both determined that the Korean imports did not cause material injury to the United States SRAM industry. Commissioner Miller also determined that the Taiwanese imports did not cause material injury. Commissioner Bragg, however, made an affirmative material injury determination regarding the Taiwanese imports.
 
 
 7
 Commissioner Bragg determined that the volume, in billions of bits, of Taiwanese SRAMs increased nearly threefold during the period under investigation. She thus determined that the increase in volume of Taiwanese SRAMs was significant in absolute terms. Commissioner Bragg further determined that the substantial and increasing volumes of LTFV Taiwanese imports "depressed prices for the domestic like product to a significant degree." First Determination, at 36. Under 19 U.S.C. 1677(11), the tie vote between Commissioner Bragg and Commissioner Miller resulted in an affirmative final determination of material injury by the Commission.
 
 
 8
 On appeal, the Court of International Trade agreed with the Commission that "substantial evidence supports the conclusion that there was significant price underselling by the Taiwanese imports." Taiwan I, 59 F. Supp. 2d at 1333. The court also agreed with the Commission that the increase in absolute volume of imports from Taiwan was significant. The court, however, did not affirm the Commission's determination of material injury. Instead, the court stated that it could not adequately review the Commission's determination without further explanation as to how the Commission evaluated the significance of the Taiwanese LTFV imports in view of other price depressing effects. In the words of the trial court, "it is paramount in this regard that the Commission 'examine other factors to ensure that it is not attributing injury from other sources to the subject imports.'" Taiwan 1, 59 F. Supp. 2d at 1331 (quoting H.R. Doc. No. 103-316, vol. 1, at 851-52 (1994)). The court also sought an explanation from the Commission as to how the increase in volume of imports from Taiwan was significant relative to domestic consumption. The Court of International Trade therefore remanded to the Commission for such further explanations.
 
 
 9
 On remand, the Commission did not make any additional investigations into the effect of the subject imports on the United States industry. Rather, the Commission further explained its original decision based on the record. The Commission supplied explanations that the significance of the absolute volume increase in Taiwanese imports supported its material injury determination even if that volume increase might be insignificant relative to consumption. The Commission also stated the negative effect of non-subject imports on the domestic industry did not render the effects of the Taiwanese LTFV imports insignificant. On appeal, the Court of International Trade sustained the Commission's conclusion that the overall volume of subject imports was significant. Taiwan II, 93 F. Supp. 2d at 1293. The court, however, neither affirmed nor reversed the Commission's material injury determination. Rather, the Court of International Trade could not conclude that the record as a whole supports the Commission's finding that non-subject imports were not significantly competitive in the same market with domestic and Taiwanese SRAMs. The court thus remanded for more explanation of the Commission's finding that Taiwanese imports caused material injury to the domestic industry.
 
 
 10
 Three new Commissioners, Hillman, Koplan, and Okun, participated in the second remand along with Commissioners Bragg and Miller. The three new Commissioners adopted the dissenting views of Commissioner Miller from the two previous Commission determinations and added some additional views, concluding that the Taiwanese imports did not cause material injury to the domestic industry. On appeal, the Court of International Trade affirmed the Commission's negative material injury determination. Micron appeals. This court has jurisdiction under 28 U.S.C. 1295(a)(5) (1994).
 
 II.
 
 11
 On substantial evidence questions, this court reviews the Court of International Trade's review of Commission decisions by stepping into the shoes of the Court of International Trade and duplicating its review under the standard in 19 U.S.C. 1516a(b)(1)(B)(i) (1994). Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 982-83 (Fed. Cir. 1994). However, "this court will not ignore the informed opinion of the Court of International Trade" in performing its review. Id. at 983. "That court reviewed the record in considerable detail. Its opinion deserves due respect." Id.
 
 
 12
 The first question on appeal in the present case is whether the Court of International Trade properly remanded the Commission's initial decision. In Trent Tube v. Avesta Sandvik Tube AB, 975 F.2d 807, 813 (Fed. Cir. 1992), this court reviewed the Court of International Trade's decision to remand an initial Commission determination. In that case, the Commission's initial determination was split three to two on material injury. The Court of International Trade concluded that one of the Commissioner's analyses and determinations lacked a proper foundation and focused improperly on the intent of the importer and on injury to competition rather than on injury to the domestic industry. Instead of applying the mandatory test for determining material injury under 19 U.S.C. 1677(7)(B)(iii) and 1677(7)(C)(iii), the Commissioner had applied her own five-factor test. The trial court concluded that the Commissioner's determination was thus not supported by substantial evidence and was not in accordance with law. The Court of International Trade remanded for the Commissioner to reevaluate her negative material injury determination. This court, duplicating that review, also reviewed the record under the substantial evidence standard.
 
 
 13
 In the present case, the Court of International Trade did not find that the Commission's first determination was not supported by substantial evidence or that the Commission did not make its determination in accordance with law. In other words, the trial court performed no substantial evidence review at all for this court to review. The Court of International Trade also did not request the Commission to perform any further investigation. Rather, the court remanded the Commission's determination for further explanation. The standard of review for the Court of International Trade's request for further explanation of agency action is a matter of first impression for this court.
 
 
 14
 The Supreme Court has explained: "If the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course . . . is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). A court's judgment as to whether the record before it needs further explanation in order for the court to understand and properly evaluate the agency's action is a determination that lies within the discretion of the court. Thus, this court reviews the Court of International Trade's decision to remand for a further explanation from the Commission for abuse of discretion. See Marshall v. Lansing, 839 F.2d 933 (3d Cir. 1988) (holding that the district court did not abuse its discretion by deciding to remand a Parole Commission's determination for further explanation).
 
 
 15
 In reviewing the trial court's discretion, this court examines its reasons for remand for any legal error. The Court of International Trade gave reasons for seeking additional explanation. Specifically, the trial court could not find in the Commission's determination a causal nexus between the subject imports and the material injury. The Commission determines whether "an industry in the United States . . . is materially injured . . . by reason of [the subject LTFV] imports" by applying standards required under title 19 of the United States Code. 19 U.S.C. 1673d(b) (1994). Material injury is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. 1667(7)(A) (1994). To determine whether imports have caused material injury, the Commission evaluates three factors: (1) the volume of the imports under investigation; (2) the effect of the imports on prices for domestic like products; and (3) the impact of imports on domestic producers. 19 U.S.C. 1677(7)(B)(i) (1994). The Commission's evaluation under the third factor must include an evaluation of "all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. 1677(7)(C)(iii) (1994).
 
 
 16
 In Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997), this court explained the statute's causal requirement: "[A] showing that economic harm to domestic industry occurred when LTFV imports are also on the market is not enough to show that the imports caused a material injury." To reach an affirmative material injury determination, the "by reason of" statement in the statute requires the Commission to find both material injury and record evidence to show that the subject imports caused the injury. Id. In other words, to properly make a material injury determination, the Commission must analyze "contradictory evidence or evidence from which conflicting inferences could be drawn," Suramerica, 44 F.3d at 985 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)), to ensure that the subject imports are causing the injury, not simply contributing to the injury in a tangential or minimal way. Gerald Metals, 132 F.3d at 722. In Gerald Metals, as in this case, the record did not show that the subject imports caused the material injury in light of the dominant presence of non-subject imports in the marketplace.
 
 
 17
 This court in Gerald Metals applied the antidumping law as it existed prior to amendment effective on January 1, 1995, by the Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465, tit. II, 108 Stat. 4809, 4842 (1994). The URAA did not deviate from the pre-existing causation standard enunciated in Gerald Metals. Rather, as explained in the Statement of Administrative Action accompanying the URAA, it echoed that standard: "[T]he Commission need not isolate the injury caused by other factors from injury caused by unfair imports. . . . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." H.R. Doc. No. 103-316, vol. 1, at 852 (emphasis added).
 
 
 18
 In its First Determination, the Commission, in Commissioner Bragg's governing opinion, did not specifically analyze causation. The Commission instead identified three other factors that contributed to the decline of SRAM prices: (1) oversupply due to incorrect forecasts that overestimated future growth; (2) competition from a growing volume of non-subject imports; and (3) "learning curve" effects. First Determination, at 19. However, the Commission did not consider the injurious effects of these other factors together with the injurious effects of the subject imports. The record was, therefore, unclear as to whether the Commission may have improperly "attribut[ed] injury from other sources to the subject imports." Thus, applying the proper causation standard, the Court of International Trade did not abuse its discretion by remanding to the Commission for further explanation about whether the subject imports were causing material injury to domestic industry.
 
 III.
 
 19
 In its Redetermination, the Commission reevaluated the volume, price, and impact of the Taiwanese SRAMs to conclude that the subject imports did not cause material injury.[1] In its volume determination, the Commission first found that import volume of Taiwanese SRAMs was significant in absolute terms. Indeed, according to the evidence supplied by the Commission, Taiwanese imports increased nearly threefold in billions of bits from 1994 to 1997. Thus, substantial evidence supported the Commission's determination regarding absolute volume.
 
 
 20
 Although Taiwanese import volume was significant, the Commission concluded that: "When evaluated in the context of the conditions of competition, however, the volume of subject imports, and increase in volume, are not sufficient to demonstrate that the subject imports themselves made a material contribution to any injury experienced by the domestic industry." Redetermination, at 4. The Commission's conclusion was based on its further findings that the subject imports did not have significant price depressing or price suppressing effects, and did not have a significant impact on the domestic industry.
 
 
 21
 Of the six products investigated by the Commission, products 3, 5, and 6 were sold to the United States market by both United States and Taiwanese suppliers for the entire period of investigation, from 1994 to 1997. For all of these products, the prices were high in 1994 and 1995 but dropped dramatically towards the end of 1995 and into 1996 and 1997. The Commission explained that in 1994 and 1995, the United States SRAM industry forecasted high future demand due to an expected need for cache memory in 80% of personal computer systems. First Determination, Commissioner Miller dissenting, at 41. The industry anticipated widespread SRAM shortages in 1996. Id. SRAM purchasers thus accumulated large inventories, leading to tight supply. Id. Rather than falling in price, as is typical for semiconductor products that are "old" on the market, SRAM prices increased in 1995. At the same time, producers and new suppliers added new capacity for manufacturing and supplying SRAMs. First Determination, Commissioner Miller dissenting, at 41.
 
 
 22
 Contrary to the demand forecasts, less than 20% of personal computer systems on the market required SRAMs. Id. The previous industry overestimates resulted in a large oversupply. Many purchasers sold off their SRAM inventories or required vendors to take returns, thereby putting further downward pressure on prices. Id. Accordingly, the United States Industry dramatically decreased SRAM prices, in tandem with foreign suppliers, as supported by substantial evidence based on the pricing information for products 3, 5, and 6.
 
 
 23
 Both United States and Taiwanese suppliers entered products 1, 2, and 4 onto the United States market in 1995, 1996, and 1994 respectively, the Taiwanese suppliers trailing the United States suppliers by a few months in each introduction. These products showed similar pricing trends to products 3, 5, and 6. Id. In addition to oversupply, the Commission explained that these products may have experienced "learning curve effects." Redetermination, at 5-6. The learning curve effect occurs when manufacturers gain knowledge and experience with a new product that allows them to reduce manufacturing costs resulting in lower prices. Moreover, as explained above, new SRAM products typically decrease in price as they "age" on the market from competition from similar and improved products. Because products 1, 2, and 4 were all new products, learning curve effects and competition from other products, along with oversupply, may have contributed to their decrease in price.
 
 
 24
 In 1996 and 1997, over half of the Taiwanese imported SRAMs were priced higher than domestic SRAMs for products 3, 4, and 5. In the same two years, Taiwanese imports of products 1, 2, and 6 were priced lower than domestic SRAMs. However, in 1997, Korean imports of product 6 were consistently priced lower than Taiwanese imports. In 1994 and 1995, Taiwanese imports undersold domestic SRAMs in all 6 product categories. In those two years, however, Taiwanese market share in terms of dollar value and quantity actually dropped somewhat, as did the United States market share. The share of non-subject imports, including Korean imports, however, increased during this time.
 
 
 25
 Over the entire timeframe of the investigation, i.e., 1994 to 1997, Taiwanese market share, in terms of dollar value, remained flat. Likewise, Taiwanese market share in quantity remained relatively flat, fluctuating from about 9% to about 11.5%. Id. United States market share in terms of quantity dropped from about 49% to about 34% while the market share of non-subject imports increased from 42% to 54.5%. Id.
 
 
 26
 Reviewing price, volume, and market share data, substantial evidence supports the Commission's determination that Taiwanese imports had a minimal, or tangential, injurious effect on domestic industry over the period of investigation. Although Taiwanese SRAMs undisputedly undersold United States SRAMs overall, Taiwanese prices dropped in tandem with United States prices and the prices of other imports. During the time of greatest injury to United States producers in 1996 and 1997, Taiwanese imports frequently oversold United States imports. The pattern of price increase then decline of both Taiwanese and United States SRAMs follows the industry's announcements of high SRAM need, followed by oversupply and overcapacity due to overestimation of need. Likewise, the pattern of sharp price declines on new United States and Taiwanese products follows the pattern of learning curve effect, particularly in combination with market oversupply.
 
 
 27
 Market share data demonstrates that although Taiwanese market share in quantity remained relatively flat while United States market share decreased, the market share of non-subject imports, mainly from Korea and Japan, increased. Thus, substantial evidence supports the fact that the United States market share was impacted largely by non-subject imports.
 
 
 28
 Certainly, the high volume and low price of Taiwanese SRAMs had some injurious impact on United States industry. However, substantial evidence supports the Commission's conclusion that oversupply, learning curve effects, and non-subject imports caused material injury to domestic SRAM industry between 1994 and 1997, and that the Taiwanese imports did not materially contribute to that injury.
 
 CONCLUSION
 
 29
 This court affirms the Commission's determination that LTFV Taiwanese imports did not cause material injury to domestic industry.
 
 COSTS
 
 30
 Each party shall bear its own costs.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 The parties do not dispute the Court of International Trade's second remand decision.