# United States Court of Appeals for the Federal Circuit

———————————

**DIAMOND SAWBLADES MANUFACTURERS COALITION,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**v.**

**SAINT GOBAIN ABRASIVES, INC.,**
*Defendant-Appellant,*

**and**

**EHWA DIAMOND INDUSTRIAL CO., LTD.,**
*Defendant-Appellant,*

**and**

**SHINHAN DIAMOND INDUSTRIAL CO., LTD.,**
*Defendant.*

———————————

2009-1274, -1275

———————————

Appeal from the United States Court of International Trade in case No. 06-00247, Senior Judge R. Kenton Musgrave.

———————————

Decided: July 6, 2010

---

DANIEL B. PICKARD, Wiley Rein LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was MAUREEN E. THORSON.

CHARLES A. ST. CHARLES, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States. With him on the brief were JAMES M. LYONS, General Counsel, and NEAL J. REYNOLDS, Assistant General Counsel.

LYNN M. FISCHER FOX, Fischer Fox Global, PLLC, of Washington, DC, argued for defendant-appellant Saint-Gobain Abrasives, Inc.

JARROD M. GOLDFEDER, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for defendant-appellant Ehwa Diamong Industrial Co., Ltd. With him on the brief were SPENCER S. GRIFFITH, J. DAVID PARK and LISA W. ROSS.

---

Before BRYSON, LINN, and DYK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LINN. Opinion dissenting-in-part filed by *Circuit Judge* DYK.

LINN, *Circuit Judge.*

This is an antidumping case. Saint Gobain Abrasives, Inc. ("Saint Gobain") and Ehwa Diamond Industrial Co., Ltd. ("Ehwa") (collectively, "Appellants") challenge two decisions of the Court of International Trade. Both decisions reviewed final determinations of the International Trade Commission ("ITC" or "Commission") on material injury to a domestic industry by reason of imports of

sawblades and parts thereof from Korea and China. First, Appellants challenge a Court of International Trade decision remanding for further consideration an original Commission determination that there was neither material injury nor threat of material injury to the domestic diamond sawblade industry. *Diamond Sawblades Mfrs. Coal. v. United States*, No. 06-00247 (Ct. Int'l Trade Feb. 6, 2008) ("*DSMC I*"). Second, Appellants challenge a Court of International Trade decision sustaining the Commission's determination on remand, which affirmed its original negative finding as to present material injury, but found that there was a threat of material injury to the domestic industry. *Diamond Sawblades Mfrs. Coal. v. United States*, No. 06-00247 (Ct. Int'l Trade Jan. 13, 2009) ("*DSMC II*"). Because the Court of International Trade did not abuse its discretion when it ordered the remand in *DSMC I* and because it correctly found that the Commission's determination on remand was supported by substantial evidence in *DSMC II*, we affirm the Commission's affirmative finding that imports of sawblades and parts thereof from China and Korea pose a threat of material injury to the domestic industry.

## BACKGROUND

Diamond sawblades are circular cutting tools with a diamond-impregnated cutting surface, or blade, used primarily to cut materials such as cement, marble, brick, tile, and stone. Because various characteristics of the sawblades affect how much the finished product will cost and how it will be used, domestic producers and importers collectively offer thousands of different variations of diamond sawblades. The primary differentiating characteristics are the type of blade rim, the diameter of the blade, and the method of attaching the blade to a metal core. There are two types of blade rims—segmented and continuous. While there is some overlap between the two,

segmented blades are more often employed in high-volume construction projects. The blades typically range in diameter from 4 inches to 70 inches. Sawblades greater than 20 inches in diameter are typically custom-made for professional use in commercial construction. These large sawblades often require quick turnaround from order to delivery and customer service from the manufacturer in the field. Sawblades with diameters less than 20 inches are generally produced in larger quantities for contractors and individual consumers. Finally, there are three primary ways to attach a blade to a metal core—laser-welding, soldering, and sintering. Laser-welding is generally used to produce segmented blades for use in hand-held saws, soldering is mostly used for specialized commercial projects, and sintering is primarily used for continuous rim blades with smaller diameters. The domestic diamond sawblade market is supplied by three sources: domestic producers, imports from the subject countries of Korea and China, and imports from other countries.

On May 3, 2005, the Diamond Sawblades Manufacturers Coalition and its nine individual members ("DSMC") filed a petition with the Commission alleging that its defined industry in the United States had been harmed by finished diamond sawblades and diamond sawblade parts imported from China and Korea ("subject imports") and sold in the United States at "Less Than Fair Value" ("LTFV"). The petition sought the imposition of antidumping duties against the subject imports. After affirmative preliminary findings by the Department of Commerce that the imports in question were indeed being sold at LTFV, the Commission commenced an investigation to determine whether the imports had caused or threatened to cause a material injury to an industry in

the United States.  This investigation covered the period from 2003 to 2005.

## I.  The Commission's Original Determination

In conducting its investigation, the Commission compiled relevant data, sent out questionnaires to domestic producers and importers of diamond sawblades, and held hearings.  Despite the wide variety of diamond sawblades, the Commission determined that there was a single domestic product most similar in characteristics and uses to the foreign articles under investigation ("domestic like product") consisting of all diamond sawblades.  Because it found that there was "at least a reasonable overlap of competition between and among subject imports from China, subject imports from Korea, and the domestic like product," the Commission aggregated the subject imports for purposes of its price effect and volume analysis. *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-1093 (Final), USITC Pub. 3862, slip op. at 24 (July 2006) ("*Original Determination*").

In its *Original Determination*, the Commission found that during the period of investigation the volume of subject imports significantly increased, the subject imports significantly undersold the domestic like product, and the domestic industry lost market share.  However, it found that this increase in volume and underselling did not have a significant effect on prices for the domestic product.  In addition, the Commission noted that the condition of the domestic industry was largely positive: the industry remained profitable, the industry's capacity to produce diamond sawblade cores increased, and aggregate capital expenditures increased over the period of investigation.  This lack of negative adverse effects was attributed to the Commission's finding that competition

between the subject imports and the domestic like product was limited by differences in: (1) the type of end user to which sales are made; (2) the diameters of blades sold; and (3) differences in blade type and manufacturing process.  The Commission found that the "large and growing volume of subject imports was largely concentrated in size ranges and customer types other than those served principally by the domestic industry."  *Id.* at 32. Specifically, the Commission found that subject imports had been focused on the demand for smaller diameter, general use sawblades ("nearly half" of subject importer's U.S. shipment value was for sawblades less than 10 inches in diameter), while domestic producers were focused on the demand for larger diameter, professional-use sawblades used in commercial construction ("nearly half" of U.S. shipments were in sizes 14 inches and larger). The Commission also noted that a "significant" percentage of the import sales were of sintered or continuous rim sawblades and a "significant" percentage of the domestic industry's sales consisted of soldered or brazed segmented products.  Finally, the Commission found that import sales were directed primarily to "branded" distributors who sold to both end users and retailers, and that U.S. producer sales were primarily to "other distributors" and end users.  Based on these findings of market segmentation and limited competition, the Commission found that there was "no causal nexus between the subject imports and the condition of the domestic industry." *Id.* at 38.

The Commission listed the following facts in support of its conclusion that there was a lack of negative price effect on domestic products despite significant underselling: (1) the importance of non-price factors—availability, delivery time, product consistency, product quality, and reliable supply; (2) the increase in price for the domestic product during the period in certain instances; (3) the

decrease in price for the domestic product even when subject import prices for that product increased or remained the same in certain instances; and (4) the fact that in 12 of 17 combinations in which U.S. producers' prices trended downward, these decreases were accompanied by increased volumes of the U.S. product—a "price/volume" tradeoff. The commissioners unanimously concluded that the domestic diamond sawblade industry was not materially injured by reason of subject imports from China and Korea.

Four of the six commissioners also concluded that the domestic industry was not threatened with material injury by reason of subject imports from China and Korea. The majority based its conclusion on the strong overall demand for diamond sawblades in the U.S. market, the limited competition with subject imports, and the sturdy financial performance of the domestic industry during the period of investigation. Two of the six commissioners dissented, finding that "import trends, together with declining prices and the weakening condition of the domestic industry, will result in material injury by reason of subject imports unless antidumping orders are issued." *Id.* at 43. The dissent found the majority's limited competition theory flawed, noting that: (1) overlap in usage existed in the mid-range diameter category, with some 12 to 14 inch blades used in both professional and general use markets; (2) the overwhelming majority of both U.S produced and imported diamond sawblades were laser-welded segmented blades; and (3) the products ultimately were purchased and used by the same end users. The dissent concluded that the domestic industry remained profitable during the period of investigation due to aggressive cost-cutting measures, but that the industry had exhausted its options for averting adverse impacts and thus was likely to suffer future material injury due to the

rising volume of subject imports and large underselling margins.

## II.  The Decision of the Court of International Trade in *DSMC I*

DSMC challenged the Commission's *Original Determination* at the Court of International Trade arguing that it was not supported by substantial evidence and otherwise was not in accordance with law pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i).  *DSMC I*, slip op. at 10.  The ITC and Appellants opposed.  On review, the Court of International Trade found problems with the logic and evidentiary underpinnings of the Commission's *Original Determination*.  First, the court found that "the Commission's conclusion of attenuated competition based on sawblade diameter is not supported by substantial evidence of record" in any of the three defined categories—blade size, manufacturing process, and channels of distribution.  *Id.* at 13.  The court noted that, in focusing on the fact that "nearly half" of the subject imports comprised sawblades under 10 inches while "nearly half" of domestic shipments were of sawblades over 14 inches, the Commission did not appear to take into account that the other half of all subject and domestic diamond sawblades were sold in the mid-range sizes and therefore were possibly competing.  The court also found that almost all of these mid-size diamond sawblades were laser-welded and segmented.  Finally, the court found that the Commission had not provided adequate explanation of its decision to divide the distributor channels into "branded" and "other" and its conclusion that those distributor channels serve different end users.  In light of its determination that the Commission's finding of limited competition could not be supported as explained, the court concluded that the related findings dealing with volume, price effects, impact, and threat analysis, along with the

finding on limited competition, all need to be remanded for reconsideration.

The court also found that the Commission had not provided adequate explanation of its finding that the price/volume tradeoff counteracted any negative price effects because it had not pointed to any data indicating that the volume increase was an adequate tradeoff for the lowered prices. The court ordered that "[o]n remand, the Commission must provide a more thorough explanation for this finding, as well as an explanation as to how the purported price/volume tradeoffs would indicate competition among domestic producers." *DSMC I*, slip. op. at 23.

Finally, the court found that the Commission's refusal to investigate allegations of lost sales and lost revenues because they were incomplete was not a remandable error because it was within the Commission's discretion. However, the court cautioned that "the information contained in the lost sales allegations may be of greater importance on remand, and that some investigation of the incomplete allegations may then be appropriate." *Id.* at 21. In addition, the court remanded the agency's volume, impact, and threat findings since they relied on the flawed limited competition finding.

III. The Commission's Determination on Remand

In the time between the Commission's *Original Determination* and the court's remand, the composition of the Commission changed. Two commissioners were replaced with new appointees. In the remand proceedings, "the Commission reopened the record to obtain additional information from purchasers about the degree of competition between subject imports and the domestic like product." *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-1093, slip op. at 2 (May 14, 2008) ("*Remand Determination*"). The

Commission sent supplemental questions solely to purchasers that had responded to the initial questionnaires during the original investigation. All interested parties filed comments on *DSMC I* and the supplemental record, but the Commission did not hold an additional hearing.

On May 14, 2008, the Commission filed its determination on remand. Once again, the Commission unanimously found that the domestic industry as a whole had not suffered material injury by reason of the subject imports from China and Korea. The Commission reiterated that although subject imports increased significantly and undersold the domestic like product by significant margins during the period of investigation, the industry was able to maintain its production, sales, and profitability because of considerable increases in demand and the industry's success in reducing expenses and improving productivity.

The two new commissioners joined the remaining dissenting commissioner from the *Original Determination* in finding that there was an affirmative threat of material injury. This led to a tie vote of three to three on the issue of threat of material injury. Because a tie vote is deemed to be an affirmative determination pursuant to 19 U.S.C. § 1677(11), the *Remand Determination* found there was a threat of material injury to the domestic diamond sawblade industry by imports from China and Korea. The Commission's reversal of its threat determination was based, in part, upon its reversal on the issue of competition. The prevailing commissioners (the "majority") found an overlap in usage by the professional and general-use market, especially in the mid-range diameter category. In addition, the majority found that both imported and U.S.-produced diamond sawblades were laser-welded, segmented blades. Finally, the majority found that although "the type of distributor (branded or other) for domestic

and imported diamond sawblades frequently differs, the products ultimately are purchased and used thereafter largely by the same types of end users." *Id.* at 7. Based on these findings, the majority concluded that "the record leaves no doubt that there is considerable overlap in the mid-range sizes and that U.S.-, Chinese-, and Korean-produced finished diamond sawblades compete with each other in the same end-user markets and across the range of product sizes." *Id.* at 12.

The majority also found that although demand grew significantly during the period of investigation, this growth was not expected to continue. In addition, the majority found that the volume of subject imports was likely to continue to rise in part because of the increasing production capacity of the importers. Based on those findings, the majority predicted a significant negative impact on the domestic industry's sales volumes, production levels, profitability, market share, and prices. Thus, the majority concluded that "based on import trends, declining prices, flattening demand, the domestic industry's weakening condition, and its diminished opportunities to reduce expenses or improve productivity, the industry is threatened with material injury by reason of the cumulated subject imports." *Id.* at 3-4.

The dissent disagreed with the majority's conclusion that competition in the industry was not limited by a market divided by sawblade characteristics. Instead, the dissent adopted the majority's opinion in the *Original Determination*, finding that competition was severely limited by the type of end user to which sales were made, the size ranges of the blades sold, and differences in blade type and manufacturing process. The dissent noted that while there was competition in the mid-range sizes, this competition was further limited by differences in channel of distribution, customer types, and blade types. It ex-

plained that "because prices for the product from the same source (domestic, China, or Korea) vary, in many instances, dramatically, for the same narrowly defined product depending on whether the product is sold to a branded or other distributor, there are very real differences between these two customer types." *Id.* at 61. The dissent also stated that since the Commission's customary practice is to examine only direct purchasers, not those purchasers further down the distribution chain, analysis of the ultimate end users was irrelevant.

## IV. The Decision of the Court of International Trade in *DSMC II*

Appellants challenged the *Remand Determination* in the Court of International Trade arguing that the Commission was incorrect when, on remand, it found that there was substantial competition between the subject imports and the domestic like product. The Court of International Trade affirmed the *Remand Determination*, finding that: (1) substantial evidence supports the finding that competition was not attenuated by blade size, process of manufacture, type of end user, or channel of distribution; (2) substantial evidence supports the finding of flattening demand and increasing subject imports; (3) substantial evidence supports the finding that subject importers had the ability to infiltrate the professional sawblades sector; (4) the decision to cumulate subject imports in its threat analysis was not unreasonable; (5) the Commission's threat finding was based on substantial evidence; and (6) Appellants failed to exhaust their administrative remedies and therefore waived any argument that the Commission failed to apply the *Bratsk* test. *Id.* at 7-26; *see Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006) (outlining a requirement that the Commission include an explanation of

the effect of non-subject imports in a material injury analysis).

\* \* \*

Appellants challenge both Court of International Trade decisions and request that we reinstate the Commission's *Original Determination*. In the alternative, Appellants request that we vacate the Court of International Trade's affirmance of the *Remand Determination* in *DSMC II* and remand the case to the Court of International Trade for further proceedings. DSMC responds by arguing that both Court of International Trade decisions were correct. First, DSMC asserts that the Commission's *Original Determination* could not be sustained on the bases proffered by the agency and therefore the Court of International Trade's remand order was correct. Second, DSMC argues that the Court of International Trade's affirmance of the *Remand Determination* is correct and should be affirmed. The ITC on behalf of the United States, Defendant-Appellee, responds to this appeal by supporting both Commission decisions—the *Original Determination* and the *Remand Determination*—as being supported by substantial evidence and in accordance with law. Thus, the ITC joins Appellants in requesting that we reinstate the Commission's *Original Determination*. However, in the event we affirm the Court of International Trade's remand of the *Original Determination*, the ITC joins DSMC in requesting that we affirm the Court of International Trade's affirmance of the *Remand Determination*.

We have jurisdiction to review both *DSMC I* and *DSMC II* pursuant to 28 U.S.C. § 1295(a)(5). *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004).

### DISCUSSION

### I. Standard of Review

"We review the [Court of International Trade's] evaluation of Commission factual determinations by stepping into the shoes of the Court and duplicating its review, evaluating whether Commission determinations are unsupported by substantial evidence or otherwise not in accordance with law." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) (citations omitted). Although such review amounts to repeating the work of the Court of International Trade, we have noted that "this court will not ignore the informed opinion of the Court of International Trade." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks omitted). In addition, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* at 488. We review decisions of the Court of International Trade that remand decisions of the Commission for further explanation (based on an inability to evaluate on the basis of the record before the court) with the more deferential abuse-of-discretion standard. *Altx*, 370 F.3d at 1117; *Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n*, 266 F.3d 1339, 1344 (Fed. Cir. 2001).

All parties agree, correctly, that we review the Court of International Trade's decision in *DSMC II* by considering whether the *Remand Determination* is supported by substantial evidence. *Allegheny Ludlum*, 287 F.3d at 1369. The parties disagree, however, as to the appropriate standard for review of the Court of International

Trade's *DSMC I* order. Appellants and the ITC contend that the Court of International Trade, in *DSMC I*, squarely addressed the sufficiency of the evidence supporting the Commission's decision by explicitly rejecting the Commission's limited competition findings on the ground that they were unsupported by the evidence of record. Therefore, they argue we should review the Commission's *Original Determination* for substantial evidence. DSMC, on the other hand, contends that the abuse-of-discretion standard should apply to our review of *DSMC I* because to the extent the Court of International Trade "declined to find the [*Original Determination*] supported by substantial evidence, it did so in the context of being unable to conduct substantial evidence review, due to the need for further explanation of the agency's conclusions." DSMC's Br. 10-11 (internal quotation marks and citations omitted).

Appellants and the ITC assert that *Altx* and *Taiwan Semiconductor* allow for the abuse-of-discretion standard of review only when the Court of International Trade does not evaluate the substantiality of the Commission's evidence and limits its remand order to further explanation without any requirement that the Commission undertake additional investigation. They point to language in *DSMC I* referring to "substantial evidence" as confirmation that the court here made an explicit substantiality finding and that the court's request for further explanation was solely within the context of this finding. *See, e.g.*, *DSMC I*, slip op. at 13 (stating that "the Commission's conclusion of attenuated competition based on sawblade diameter is not supported by substantial evidence of record"); *id.* at 15 (stating that the "ITC's finding of attenuated competition based on manufacturing process is unsupported by substantial evidence"). However, simply using the words "substantial evidence" or referring

to the evidence of record in an opinion is not dispositive of the issue. In fact, in *Taiwan Semiconductor*, this Court used an abuse-of-discretion standard to review a remand order by the Court of International Trade, which used language very similar to that used in *DSMC I*. 266 F.3d at 1344; *Taiwan Semiconductor Indus. Ass'n v. United States*, 59 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) ("Therefore, the Court cannot conclude that the Commission's determination that the increase in volume of the subject imports was significant is supported by substantial evidence absent an explanation of how they are significant in light of the dominant presence of non-subject imports.") Instead, the deciding factor in determining what standard of review applies is "whether the record before [the Court of International Trade] need[ed] further explanation in order for the court to understand and properly evaluate the agency's action." *Taiwan Semiconductor*, 266 F.3d at 1344. Such a determination "lies within the discretion of the [Court of International Trade]." *Id.*

Similarly, in *Altx*, we held that because the two Court of International Trade remand orders on review did not "require[] additional investigation by the Commission, nor did either of the remand decisions alter a Commission determination in any substantive regard," review of the decisions was under an abuse-of-discretion standard. 370 F.3d at 1117. Again, we made this finding despite the Court of International Trade's use of language relating to substantial evidence review in its remand order. For example, in *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1360 (Ct. Int'l Trade 2001), the Court of International Trade stated that "[t]he Commission does not support its reasoning with substantial evidence." The Court of International Trade in *Altx* subsequently clarified that because of this failing, "the court is unwilling at

this point to uphold the Commission's conclusion regarding the significance of subject import volumes as based on substantial evidence in light of the lack of explanations as to potentially meaningful conflicting evidence. The court therefore remands to the Commission for further consideration and clarification of the issues. . . ." *Id.* at 1364.

On the other hand, in *Nippon Steel Corp. v. United States*, we found the proper standard of review to be substantial evidence when the Court of International Trade remanded a final determination to the Commission, giving it two options on how to proceed: "[1] reopen the record in order to obtain substantial evidence to support its adverse impact conclusion or [2] make a determination that subject imports will have no adverse impact should the orders be revoked." 391 F. Supp. 2d 1258, 1284 (Ct. Int'l Trade 2005). On appeal, we found the remand order analogous to a case where the remand order "dictated that the Commission enter a negative determination." *Nippon Steel Corp. v. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 (Fed. Cir. 2007). The Court of International Trade in *Nippon Steel* evaluated the evidence and found it lacking to such an extent that it ordered the Commission either to obtain more data or change its position entirely, thereby indicating an actual review of the evidence. As such, on appeal, a review using the substantial evidence standard was warranted.

In the present case, the court reviewed the Commission's *Original Determination* under the Administrative Procedure Act ("APA") standard of review set forth in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). Using this standard, the court found that the Commission had not "'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *DSMC I*, slip op. at 11 (quoting

*State Farm*, 463 U.S. at 43). As in *Taiwan Semiconductor* and *Altx*, the court, in remanding the *Original Determination* to the Commission, did not require additional investigation, nor did it alter the Commission determination in any substantive respect. Instead, the court simply required the Commission to explain in greater detail its decision and reasoning such that the court would have a basis for proper review. Although the court referred explicitly to "substantial evidence" in its remand order, each time it did so, the court also made clear that it found the *Original Determination* suffered from incomplete explanation. The court could not properly review the Commission's conclusions based on its explanations and its citations to the data.

For example, when analyzing the Commission's finding that competition was limited based on sawblade diameter, the court stated that the Commission's conclusion was "not supported by substantial evidence of record." *DSMC I*, slip op. at 13. However, at the end of that analysis the court explained that the Commission "fail[ed] to offer an explanation as to how this data reflects attenuated competition based on blade size." *Id.* at 15. While the court used the words "limited" and "attenuated" at different places in its opinion, it is apparent that it did not ascribe different meanings to those words, but used them synonymously to describe the Commission majority's finding that competition between subject imports and domestic industry was reduced because the market was divided based on various blade properties. The court thus clarified that it was not requiring the Commission to change its position or to gather more data on this issue, but instead was looking for a reasoned explanation incorporating the contrary record evidence. Similarly, when analyzing the Commission's finding that competition was limited based on manufacturing process, the court stated

that the conclusion was "unsupported by substantial evidence of record and cannot be sustained." *Id.* at 15. Again, however, at the end of that analysis, the court made clear that it also found that the Commission's explanation was lacking—stating that the Commission "offer[ed] no explanation as to how its data, which indicate that foreign and domestic sawblades in the midrange sizes are both laser welded and segmented, show attenuated competition." *Id.* at 16. Finally, when discussing the Commission's finding on price/volume tradeoff, the court stated that it could not find that a single footnote, "without further explanation, constitutes either 'substantial evidence of record' or 'a reasoned explanation' for the ITC's determination." *Id.* at 23. Further, while the court noted that additional investigation of the lost sales issue might be appropriate, it specifically noted that this particular issue was not a basis of the remand and whether more investigation was necessary was left to the Commission's discretion. *Id.* at 21.

Therefore, the court in *DSMC I* remanded the *Original Determination* to the Commission because it could not properly evaluate the Commission's conclusions based on the evidence of record. Thus, we review the Court of International Trade's decision in *DSMC I* to determine whether the court abused its discretion by remanding to the Commission for further explanation.

## II. The Commission's Original Determination

The first question on appeal in the present case is whether the Court of International Trade, in *DSMC I*, abused its discretion by ordering a remand of the Commission's *Original Determination* for further explanation. "In reviewing the trial court's discretion, this court examines its reasons for remand for any legal error." *Taiwan Semiconductor*, 266 F.3d at 1344. The primary reason the

court gave for seeking additional explanation from the Commission was that it could not reconcile the Commission's finding of limited competition with the data of record. In our view, the Court of International Trade's decision to remand was justified on several grounds.

First, the court pointed out that the data to which the Commission cited in support of its finding that "nearly half" of the subject shipments were in smaller sized blades, while "nearly half" of domestic shipments were of larger sized blades, also showed that the other half of both subject and domestic imports were concentrated in the two middle diameter ranges (10 to 12 inches and 12 to 14 inches). *DSMC I*, slip op. at 8. Appellants and the ITC argue that the Commission properly justified the limited competition finding despite the significant overlap in the mid-range by explaining that competition was further attenuated by differences in blade type, manufacturing process, and type of end users.[1] However, the court also found this aspect of the Commission's explanation inadequate. Specifically, the court pointed out that the record showed that in the mid-range blade category, most of the blades were segmented and laser-welded for both importers and domestic producers. *DSMC I*, slip op. at 16 (Table II-1). Therefore, neither blade type nor manufacturing process significantly limited competition in the mid-range category. Finally, the court noted that the Commission based the subdivisions of "branded" and "other" on the type of customer to whom the distributors primarily sold

[1]    The Court of International Trade did err in stating that "more subject imports were concentrated in the two midrange categories than the two small-blade categories." *DSMC I*, slip op. at 15. The numbers in the relevant table, Table I-1, actually show that this was true for only one of the three years listed in the table—2005. However, this misstatement was harmless as the Court's logic did not depend on this particular fact.

("branded" predominantly sold small sawblades to end-users and "other" sold mostly large sawblades), but the court concluded that the data did not support these classifications. *Id.* at 16-18. In fact, data referencing customer types did not suggest that branded or other distributors' customer bases could reliably be identified. *Id.* A remand based on the Commission's confusing and potentially incorrect analysis was not an abuse of discretion.

An additional ground that supports the Court of International Trade's remand in *DSMC I* was the failure to adequately explain the Commission's finding that a price/volume tradeoff offset any negative price effects due to subject imports. The record before the court contained no data regarding the costs of production, meaning there was no way to tell whether the lowered prices translated into increased profits. *Id.* at 21-23. Appellants and the ITC argue that this price/volume tradeoff conclusion was merely secondary to the Commission's overall conclusion that subject imports were not a cause of significant price effects. Instead, they point out that the Commission also relied on other factors as evidence that the subject imports were not a cause of negative price effects including: the importance of non-price factors in purchasing decisions; the limited competitive overlap; the limited correlation between subject import prices and the prices of domestic diamond sawblades; the lack of negative impact on domestic producers' shipments; the only modest increase in cost of goods sold as a percentage of net sales; and the lack of significant confirmed lost sales or lost revenues. While the court acknowledged these multiple bases for the Commission's price effects finding, the court did not find this discussion sufficient to overcome what it saw as an unreasonable conclusion regarding price/volume tradeoff. *Id.* It was not an abuse of discretion for the court to require additional explanation from

what it saw as a failure to adequately explain its conclusion regarding price/volume tradeoff.

Finally, the Commission's finding of threat relied on its inadequate limited competition analysis. The court thus stated that it was in "substantial doubt whether the [Commission] would have made the same ultimate finding with the erroneous findings removed from the picture." *Id.* at 13 (internal quotation marks omitted).

Because the Commission's determination of limited competition was not adequately explained in light of the record evidence, the Court of International Trade's remand order was not an abuse of discretion. We decline to disturb the decision in *DSMC I*.

## III. The Commission's Remand Determination

Having concluded that the *Original Determination* should not be reinstated, we turn to Appellants' argument that the *Remand Determination* was not supported by substantial evidence. Appellants' main argument is that on remand, the Commission majority ignored the record evidence showing limited competition, as determined by the majority in the *Original Determination*. Appellants contend that the Commission assumed that the mere existence of some overlap in sales by subject and domestic producers was sufficient to conclude that they compete head-to-head across all size ranges. Specifically, Appellants assert that the Commission ignored the fact that much of the increase in subject import volumes was in size ranges and to customer types to which the domestic industry did not sell, and that the Commission also ignored differences between distributors. Appellants also argue that the Commission's threat of material injury finding was based on the following unsupported findings: (1) demand was "flattening"; (2) import volumes would continue to increase; (3) underselling by imports would

continue; (4) the domestic industry would not maintain its strong profitability; and (5) subject imports could service the professional construction sector. Finally, Appellants assert that the Commission improperly declined to apply the non-subject replacement test outlined in *Bratsk*. 444 F.3d 1369.

The Commission's factual determinations are "presumed to be correct," and "[t]he burden of proving otherwise shall rest upon the party challenging such decision." 28 U.S.C. § 2639(a)(1). After reviewing the record, we agree with DSMC and the ITC that substantial evidence supports the views of the Commission on each of the matters raised by Appellants on appeal. Accordingly, finding neither legal error nor insufficient evidence in the Commission's *Remand Determination*, we affirm the decision of the Court of International Trade in *DSMC II*.

The concern underlying the Court of International Trade's remand in *DSMC I*—that the Commission had not adequately explained its limited competition finding—was cured by the Commission in the *Remand Determination*, as the majority found that competition was not so limited. Instead, the Commission found significant overlap in imported and domestic mid-range sawblades. This conclusion was supported by substantial evidence. As explained in *DSMC I*, the record shows that approximately half of imports and domestic products were in the mid-range category and a majority of those were laser-welded. *DSMC I*, slip op. at 14-16 (Table I-1, Table II-1). In addition, a majority of both imported and domestic sawblades were both laser-welded and segmented. *International Trade Comm'n Staff Report*, I-23 (Table I-2) (June 5, 2006) ("*Original Staff Report*"). The Commission's finding of substantial competition is also supported by the record relating to methods of distribution. For example, the record shows that half of responders reported that

domestic producers and subject importers always, frequently, or sometimes compete in selling midrange sawblades to both professional users and contractors for general use. *Int'l Trade Comm'n Staff Report*, III-4 (Table III-2) (April 7, 2008) ("*Remand Staff Report*"). In addition, only 9 out of 39 responders indicated that sawblades used by professionals and individual consumers never compete. *Id.* III-5 (Table III-3). While there is also some support in the record for a contrary finding, the conclusion reached by the Commission need not be the only one possible from the record. "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

Nor do we find persuasive Appellants' arguments regarding the Commission's findings on threat of material injury. The record shows that a majority of importers, domestic producers, and other U.S. purchasers reported that they did not expect demand to change in the future—thereby providing substantial evidence for the Commission's finding that demand was "flattening." *Original Staff Report* II-33. The Commission also based its finding that import volumes would continue to increase on substantial evidence. During the period of investigation, the evidence shows that the volume of subject imports increased significantly both in value and in quantity. *Remand Determination* App. 1. The market share of subject imports also increased during the period of investigation, while the market share of domestic producers declined. *Id.* In addition, subject importers predicted an increase in capacity, production, and inventory. *Original Staff Report*, VII-4, VII-10 (Table VII-2, Table VII-7). The Commission's finding that subject

importers had the ability to infiltrate the larger-sized (greater than 20 inches in diameter) professional-use market was supported by the evidence that subject importers significantly increased the sales of these blades during the period of inquiry. *Id.* IV-9, IV-10 (Table IV-4) (indicating that U.S. sales of large sawblades from China more than doubled in value between 2003 and 2005 and U.S. sales of large sawblades from Korea increased 143 percent in value during that same time period). This evidence supports the Commission's conclusion that the volume of subject imports was likely to continue to rise and that underselling by subject imports would continue. The record also reveals that in addition to falling market share, the domestic industry's aggregate operating income, aggregate operating income margins, and aggregate return on assets all decreased during the period of inquiry, thus supporting the Commission's conclusion that the domestic industry would not maintain its strong profitability. *Remand Determination* App. 1.

We have considered the other arguments made by Appellants regarding a lack of substantial evidence for the conclusions of the *Remand Determination*, but find them unpersuasive.

Finally, Appellants assert that the Commission improperly declined to apply the non-subject replacement test outlined in *Bratsk* to its threat determination. In *Bratsk*, we required the Commission to assess "whether non-subject imports would have replaced the subject imports without any beneficial effect on domestic producers." *Bratsk*, 444 F.3d at 1375. The parties dispute whether this analysis is limited to present injury findings or if it also applies to threat findings. The Commission did not apply the analysis, stating that *Bratsk* "do[es] not apply to affirmative determinations based on threat of material injury, where a prospective (*i.e.*, forward-looking)

analysis is involved." *Remand Determination* at 25 n.152. The Court of International Trade declined to address the issue because "at no point in the investigation did the respondents assert that nonsubject imports played any causal role in the condition of the domestic industry." *DSMC II*, slip op. at 25. We agree with the Court of International Trade that Appellants failed to exhaust their administrative remedies on this issue. Ehwa points to several sentences in its pre-hearing and post-hearing briefs to the Commission during the original investigation as evidence that they did not waive this issue. However, these isolated statements are simply not enough to indicate that Appellants effectively presented this issue to the Commission. In addition, before the Court of International Trade, counsel for Ehwa acknowledged that he did not raise the issue before the Commission in a timely manner. *Id.* The general rule is that courts "should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Accordingly, we decline to address this argument.

CONCLUSION

We find that the Court of International Trade did not abuse its discretion in remanding the *Original Determination* to the Commission for further explanation and therefore we affirm *DSMC* I. We also affirm the Court of International Trade's decision in *DSMC II* affirming the Commission's *Remand Determination* as supported by substantial evidence.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**DIAMOND SAWBLADES MANUFACTURERS COALITION,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**v.**

**SAINT GOBAIN ABRASIVES, INC.,**
*Defendant-Appellant,*

**and**

**EHWA DIAMOND INDUSTRIAL CO., LTD.,**
*Defendant-Appellant,*

**and**

**SHINHAN DIAMOND INDUSTRIAL CO., LTD.,**
*Defendant.*

---

2009-1274, -1275

---

Appeal from the United States Court of International Trade in case no. 06-00247, Senior Judge R. Kenton Musgrave.

---

DYK, *Circuit Judge*, dissenting-in-part.

In my view, the majority's decision rests on a misreading of the Court of International Trade's decision. In the majority's view, the Court of International Trade did not set aside the International Trade Commission's ("ITC" or "Commission") original determination on substantial evidence grounds, but solely on the ground that the Commission had failed to provide an adequate explanation for its determinations that there was neither material injury nor threat of material injury to the domestic diamond sawblade industry. *See* Majority Op. 18-19.

I think that the Court of International Trade's decision rested upon two grounds—lack of substantial evidence and failure to provide an adequate explanation. *See Diamond Sawblades Mfrs. Coal. v. United States*, No. 06-00247 (Ct. Int'l Trade Feb. 6, 2008) ("*DSMC I*"). The court repeatedly stated that it found a lack of substantial evidence on various points. *See DSMC I*, slip op. at 13 ("The court finds that the Commission's conclusion of attenuated competition based on sawblade diameter is not supported by substantial evidence of record."); *id.* at 15 ("[The] ITC's finding of attenuated competition based on manufacturing process is unsupported by substantial evidence of record and cannot be sustained."); *id.* at 23. Further, the court vacated and remanded the Commission's volume finding, its price-effects determination, its impact finding, and its threat analysis as it found these conclusions to "rest, in part, upon 'findings of subsidiary fact, or inferences therefrom' that the court deems unsupportable." *Id.* at 24.

Significantly, in its later decision in *Diamond Sawblades Manufacturers Coalition v. United States*, No. 06-00247 (Ct. Int'l Trade Jan. 13, 2009) ("*DSMC II*"), in

describing its holding in *DSMC I*, the Court of International Trade stated that "[i]n its opinion, the court found that the ITC had failed to provide an adequate explanation *or substantial evidentiary support* for certain ITC findings relating to the degree of competition between subject imports and the domestic product." *DSMC II*, slip op. at 2 (emphasis added). The Commission, in its determination on remand, also viewed the Court of International Trade's decision in *DSMC I* as resting upon both grounds, stating that

> In [*DSMC I*], the Court found that the Commission's conclusion that competition between the subject imports and the domestic like product was attenuated based on sawblade diameter differences (Slip Op. at 13-15) and sawblade manufacturing process differences (Slip Op. at 15-16) *was not supported by substantial evidence of record.* The Court *further found that the Commission failed to explain adequately* its conclusion, also in the context of its limited competition analysis, that "branded distributors" and "other distributors" served different end users. Slip Op. at 16-18.
>
> The Court also instructed the Commission on remand to provide a more thorough explanation of its finding that domestic producers' price declines in certain instances reflected a volume/price tradeoff.

*Diamond Sawblades & Parts Thereof from China & Korea,* Inv. Nos. 731-TA-1092-, -1093, slip op. at 1-2 (Int'l Trade Comm'n May 14, 2008) (emphases added). The ITC, in its brief on appeal, argues that the court engaged in substantial evidence review, observing that in *DSMC I*, "the [Court of International Trade] did not merely remand the Commission's determinations for further explanation.

Instead, it explicitly rejected the Commission's limited competition findings on the grounds they were 'unsupportable.'" Defendant-Appellee ITC's Br. 22-23 n.7.

While the remand for further explanation appears to have been justified, it seems to me that the remand, insofar as it was on based on substantial evidence grounds, was improper. Initially, I note that the Court of International Trade appears to have mischaracterized the ITC's finding as involving a finding of "attenuated competition." The primary definition of "attenuated" would imply "thin" or "slender" competition. *See Webster's Third New International Dictionary* 141 (unabr. 2002). The Commission never used that phrase, but rather described the competition as "limited."

In my view, the Commission's limited competition finding was supported by substantial evidence. The Commission found that competition between the subject imports and domestic merchandise was limited by sawblade diameter size. The Commission observed that nearly half of subject imports were sold within the small-diameter sector of the market, wherein the domestic producers made only 6.3 percent of their commercial sales. Similarly, nearly half of domestic sawblades were sold to the large-diameter sector, while only 7 percent of Chinese imports and 14 percent of Korean imports were. The Commission found that there were physical differences in domestic sawblades as compared to subject imports and that these differences affected the end use of the sawblades, further supporting a finding of limited competition. The Commission also found that competition was limited by customer type as domestic and subject suppliers made the bulk of their sales to different distributor types, with subject suppliers making approximately 74 percent of their distributor sales to "branded" distributors, while the domestic industry made 71.8

percent of its sales to non-"branded" distributors. The Commission also observed that domestic producers sold a significant share of their blades directly to end users, whereas subject blades were more often used in other applications. Although there was indeed some competition in the mid-range sizes, the Commission considered this overlap, and properly found overall competition between the domestic and foreign industries to be limited. While the Court of International Trade did not err in requiring the Commission to further explain why the competition that did exist did not create a threat of material injury, the limited competition finding itself was supported by substantial evidence.

We have long held that the Commission is entitled to receive deference for its reasoned fact findings. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006) ("So long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission."). It is not the role of the reviewing court to "refind[] the facts . . . or interpos[e] its own determinations" in such proceedings. *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003). The majority recognized this principle in reviewing the court's opinion in *DSMC II* for substantial evidence, remarking that

> [w]hile there is also some support in the record for a contrary finding, the conclusion reached by the Commission need not be the only one possible from the record. "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." *Am. Silicon*

*Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

Majority Op. 24. Here, the Court of International Trade appears to have exceeded its reviewing authority in *DMSC I* in remanding the Commission's original determination as being unsupported by substantial evidence.

Under these circumstances it seems to me that the remand to the Commission was partly wrong and partly right—partly wrong in finding a lack of substantial evidence; party right in remanding for further explanation. The question then becomes how to resolve this case—a question of some complexity which has not been briefed by the parties and as to which I express no opinion. I respectfully dissent from the majority's decision insofar as it holds that the Court of International Trade's decision in *DSMC I* does not rest on substantial evidence grounds.